## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| THE ORIGINAL SOUPMAN, INC., *et al.*, | Case No. 17-11313 (LSS) |
| Debtors.[1] | Joint Administration Requested |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364 AND 507, FED. R. BANKR. P. 2002, 4001, 6004 AND 9014 AND DEL. L. R. BANKR. P. 4001-2 (I) AUTHORIZING THE DEBTORS TO OBTAIN FIRST PRIORITY AND PRIMING POSTPETITION FINANCING, (II) AUTHORIZING USE OF CASH COLLATERAL, (III) GRANTING LIENS AND SUPER-PRIORITY CLAIMS, (IV) GRANTING ADEQUATE PROTECTION TO PREPETITION LENDERS, (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF**

The Original Soupman, Inc. and its affiliated debtors an debtors in possession (the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**") move for entry of an interim order (the "**Interim Order**"), substantially in the same form attached as Exhibit A, and ultimately, a final order (the "**Final Order**" and, together with the Interim Order, the "**DIP Orders**") containing the following relief:

i.      authorizing the Debtor to obtain first priority and priming postpetition financing in the form of a 2,000,000.00 term loan (the "**DIP Loan**") as set forth in the term sheet attached as Exhibit A to this Interim Order (the "**DIP Term Sheet**"), by and between the Debtors and Soupman Lending, LLC (the "**DIP Lender**"), of which $1,000,000.00 shall be available on an interim basis, under the terms of this Interim Order and the DIP Term Sheet;

ii.      subject to entry of the Final Order (defined below), authorizing a final funding of the remainder of the DIP Loan up to $2,000,000.00;

iii.      granting security interests and liens (including liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code and priming liens pursuant to section 364(d) of the Bankruptcy Code) to the DIP Lender in the Collateral to secure all

---

[1] The Debtors, together with the last four digits of each Debtor's federal tax identification number, are: The Original Soupman, Inc. (0182); Soupman, Inc. (8630); and Kiosk Concepts, Inc. (4839). The location of the Debtors' corporate headquarters and the service address for all Debtors is 1110 South Ave., Suite 100, Staten Island, NY 10314.

obligations of the Debtors under the DIP Loan pursuant to this Interim Order and the DIP Term Sheet;

iv.     allowing superpriority administrative expense status (including pursuant to sections 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code) of the Obligations;

v.      authorizing the Debtors to execute and deliver additional documentation consistent with the terms of (or as may be required by) the DIP Term Sheet (such documents to be included in the definition of the DIP Term Sheet), and to perform such other and further acts as may be required in connection with the DIP Term Sheet;

vi.     authorizing the use of Cash Collateral (as defined below) by the Debtors effective as of the Petition Date;

vii.    granting adequate protection to the Prepetition Lenders (as defined below);

viii.   ;scheduling an interim hearing on this Motion and authorizing, from the entry of this Interim Order until the final hearing on this Motion (the "**Final Hearing**"), *inter alia*, the Debtor to obtain credit and use Cash Collateral subject to the terms and conditions set forth in the DIP Term Sheet;

ix.     scheduling the Final Hearing to consider entry of the Final Order; and

x.      granting related relief.

In support of this Motion, the Debtors respectfully represent as follows:

## Jurisdiction and Venue

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.

2.      This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). The Debtor confirms its consent, pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), to the entry of a final order by this Court in connection with this Motion, to the extent that it is later determined that the Court, absent the consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

3.      Venue is proper in this District pursuant to 28 U.S.C. § 1408.

4.      The bases for the relief requested in this Motion are sections 105(a), 361, 362,

363, and 364 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rules 4001-2 and 9003-1 of the Local Rules for the United States Bankruptcy Court District of Delaware (the "**Local Rules**").

## General Background

5.      On June 13, 2017 (the "***Petition Date***"), each Debtor filed a voluntary petition for relief pursuant to chapter 11 of the Bankruptcy Code. The Debtors are operating their business and managing their property as a debtor in possession pursuant to section 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or an examiner has been made in the Chapter 11 Cases, and no committees have been appointed or designated.

6.      The Debtor sell slow-cooked small-batch soups in 17 ounce Tetra Pak cartons to supermarkets around the U.S., including Kroger, Publix, Stop & Shop, ShopRite, Acme, Shaws, Winn Dixie and Costco and others, and in bulk frozen 4 pound bags to the food service industry including their own franchised restaurants in the United States.

7.      A detailed description of the Debtors' business, and the facts and circumstances supporting this Motion and the Debtors' Chapter 11 Cases, is set forth in greater detail in the *Declaration in Support of Chapter 11 Petitions and First Pleadings* (the "**First Day Declaration**"), filed contemporaneously therewith and incorporated herein by reference.

## Motion Background

## I.      The Debtors' Prepetition Secured Indebtedness

8.      The Debtors are liable to Hillair Capital Investments, L.P (the "**Prepetition Lender**") under the 8% Secured Notes due April 1, 2018 (the "**2018 Notes**") and the 8% Secured Notes due February 22, 2017 (the "**2017 Notes**," collectively with the 2018 Notes, the "**Prepetition Obligations**"). The Debtors are in default of 2017 Notes and have entered into

forbearance agreement with the Prepetition Secured Lenders on account of such default. The Prepetition Obligations are secured (the "**Prepetition Liens**") in all of the assets of the Debtors. As of the Petition Date, the amount of principal and interest outstanding under the 2018 Notes is $3,547,118 and the amount of principal and interest outstanding under the 2017 Notes is $121,472.

9.      On May 20, 2011, the Debtors entered into a Forbearance Agreement and Secured Guaranty with Penny Fern Hart ("**Hart**"). The Debtors subsequently defaulted and entered into a Settlement Agreement on October 9, 2015. The Hart Settlement Agreement and prior agreements were secured in all of the Debtors' assets. As of the Petition Date, the amount of principal and interest outstanding under the Hart Settlement Agreement is $743,698.00. The Debtors are in default of the Hart Settlement Agreement.

10.     In connection with the funding from the Prepetition Lender, Hart executed a Subordination Agreement dated July 27, 2016 with the Prepetition Secured Lender (the "**Subordination Agreement**"). Pursuant to the Subordination Agreement, Hart subordinated only certain payments under the Settlement Agreement to the obligations of the Prepetition Lender. In any bankruptcy proceeding, however, the Subordination Agreement subordinates the Settlement Agreement obligations to the Prepetition Lender's obligations, transfers all of Hart's security or the proceeds thereof to the Prepetition Lender, and appoints the Prepetition Lender as Hart's attorney in fact.[2]

## II.      The Debtors' Immediate Need for Financing

---

[2] The Debtors are also subject to two factoring agreements with PowerUp Lending Group, Ltd. and Platinum Rapid Funding Group Ltd. (the "**Factors**"), which agreements grant the Factors security interests in the Debtors' bank accounts and accounts receivables sold under the factoring agreements. As of the Petition Date, the Debtors do not believe there are any outstanding account receivables sold to the Factors that could still be collected. And the Debtors will open debtor in possession bank accounts, thus not utilize their prepetition bank accounts or the cash held within those accounts. Thus, any security interests of the Factors remain unaffected by this Motion and the DIP Loan.

11.    As discussed in detail in the First Day Declaration, the Debtors have an immediate need for postpetition financing in order to administer the Chapter 11 Cases, operate their business post-petition, preserve and maximize the value of the Debtors' assets for the value of creditors, and potentially consummate a sale of substantially all of its assets.

12.    Due to the fact that virtually all of the Debtors' cash constitutes cash collateral, and substantially all of its non-cash assets are subject to the Prepetition Liens and security interests of the Prepetition Lenders, the Debtors are currently without sufficient unencumbered funds with which to pay ongoing operating expenses necessary to administer the Chapter 11 Cases. The Debtors' immediate access to the proposed DIP Loan is necessary in order to administer the Chapter 11 Cases, operate the Debtors' business, preserve and maximize the value of the Debtors' assets and estates for the value of creditors, potentially consummate a sale of substantially all of the Debtors' assets, and avoid immediate and irreparable harm to the Debtors' estates and creditors.

13.    As a result of extensive arm's-length negotiations conducted by the Debtors and the DIP Lender, the DIP Lender have agreed and consented to provide the Debtor with the DIP Loan and use of Cash Collateral pursuant to the DIP Term Sheet. In addition, the Prepetition Lenders have agreed to permit the Debtor to use Cash Collateral during the interim postpetition period pursuant to the terms of the DIP Term Sheet and the Interim Order, pending a Final Hearing. These financial accommodations, as described below, should enable the Debtors to commence, and continue to administer in an orderly fashion, the Chapter 11 Cases, while exploring the potential sale of substantially all of the Debtors' assets.

**III.    The Debtors' Decision to Enter into the DIP Loan**

14.    Leading up to the Chapter 11 Cases, the Debtors explored strategic alternatives and engaged in extensive negotiations with its principal creditors in an effort to obtain additional

liquidity. Given the immediacy of the Debtors' financing needs, and the existing Prepetition Liens, the Debtors and its professionals determined that additional unsecured financing was not available. Indeed, no party (other than the DIP Lender) was in a position to provide debtor in possession financing that satisfied the Debtors' needs and on terms and conditions more favorable to the Debtors than those provided by the DIP Lender. Thus, the Debtors were unable to obtain alternative postpetition financing proposals from other lenders through credit allowable as an administrative expense or secured by liens on the Debtors' assets junior to the Prepetition Liens or on better terms than those provided by the DIP Lender.

15.     Faced with these circumstances, and given the inability to find other postpetition financing on terms and conditions more favorable to the Debtors than those provided by the DIP Lender, the Debtors engaged in good faith, arm's-length negotiations with the DIP Lender over the course of several weeks, which culminated in the DIP Loan, the DIP Term Sheet, the Budget, and the form of the proposed Interim Order. During these negotiations, the Debtors, with the assistance of its advisors, went to great lengths under difficult circumstance to achieve the best deal possible for itself and its constituencies.

16.     In this challenging credit market, the Debtors have been unable to find alternate or better financing on the terms and of the type and magnitude required in the Chapter 11 Cases on an unsecured basis, or without offering terms substantially similar or better to those provided under the DIP Term Sheet. The Debtors ultimately decided that the proposal for debtor in possession financing advanced by the DIP Lender was the most favorable under the circumstances, because it: (a) could be documented and accessed quickly; (b) adequately addresses the Debtors' reasonably foreseeable liquidity needs; and (c) maintains the going concern value of the Debtors' business. For the foregoing reasons, the Debtors respectfully

submit that entry into the DIP Term Sheet is in the best interests of their estates, creditors, and

other parties in interest.

## IV.   Material Terms of the DIP Loan and Provisions that Potentially Implicate Local Rule 4001-2

### A.   Material Terms of the DIP Loan[3]

| | |
|---|---|
| **Borrowers:** | Soupman Inc. a Delaware corporation (collectively "<u>Soupman</u>" or "<u>Debtor</u>") and its affiliated debtors (collectively, the "<u>Debtors</u>" or the "<u>Borrowers</u>"), as debtors and debtors-in-possession in the cases (the "<u>Chapter 11 Cases</u>") commenced on June 13, 2017 (the "<u>Petition Date</u>") under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>") in the jointly administered cases under case number 17-11313 (LSS). |
| **DIP Agent and Lenders:** | Soupman Lending LLC (the "<u>DIP Agent</u>") on behalf of the Lenders under this DIP Term Sheet (the "<u>DIP Lender</u>"). |
| **DIP Facility** | A term loan (the "<u>DIP Facility</u>") made available to the Borrowers in a principal amount of up to $2,000,000 (the "<u>Commitment</u>") and amounts advanced by the DIP Lender under the DIP Facility (the "<u>DIP Loan</u>") pursuant to the Budget (as defined below).<br><br>The entire DIP Loan outstanding under the DIP Facility shall become due and payable on the Maturity Date.<br><br>The DIP Facility will be documented under a Debtor-in-Possession Loan and Security Agreement in form and substance acceptable to the DIP Agent, the DIP Lender, and the Debtors (the "<u>DIP Credit Agreement</u>" and together with this DIP Term Sheet and other loan documents, the "<u>DIP Financing Documents</u>"). The DIP Credit Agreement will be prepared and submitted with the final order approving the DIP Loan. |
| **Purpose/Use of Proceeds:** | The proceeds of the DIP Loan will be used, in accordance with the terms of the Budget and DIP Orders (as defined below): (i) to fund the working capital needs and chapter 11 administrative costs of the Borrowers during the pendency of the Chapter 11 Cases, (ii) to pay fees, costs and expenses of the DIP Facility on the terms and conditions described therein (include DIP Lender's professionals), (iii) to provide adequate protection to the Prepetition Secured Parties (as defined below), and (iv) to pay other amounts as specified in the Budget. |
| **DIP Collateral:** | The DIP Liens include (I) first priority liens upon and security interests in (a) all Accounts and payment intangibles, (b) Inventory and Documents for any Inventory, and (c) all Intellectual Property and related assets and (II) priority liens upon and security interests in (i) all of those other items and types of |

---

[3] The specific terms of the DIP Term Sheet and/or DIP Credit Agreement control over the terms' recitation here.

|  | collateral in which security interests may be created under Article 9 of the Uniform Commercial Code, (ii) all of those other items and types of collateral not governed by Article 9 of the Uniform Commercial Code, including, without limitation, to the extent not permitted by applicable nonbankruptcy law, licenses issued by any federal or state regulatory authority, any leasehold or other real property interests, and commercial tort claims of the Debtors, (iii) any and all other DIP Collateral of any nature or form, and (iv) the products, rents, offspring, profits, and proceeds of any of the foregoing.<br><br>None of the DIP Obligations, DIP Liens or DIP Superpriority Claims (as defined below) shall (a) be subject to or *pari passu* with any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code, (b) be subject to or *pari passu* with any inter-company claim, whether secured or unsecured, of any Debtor or any domestic or foreign subsidiary or affiliate of any Debtor, (c) be subject to sections 510, 549, or 550 of the Bankruptcy Code, or (d) hereafter be subordinated to or made *pari passu* with any other lien or security interest under sections 361, 363 or 364 of the Bankruptcy Code or otherwise, except as expressly provided in the Interim or Final Order (as defined below). |
|---|---|
| **DIP Liens and Claims:** | The DIP Agent will be granted, for itself and the ratable benefit of the DIP Lender, the following liens and claims:<br><br>a.  Superpriority administrative expense claims pursuant to Bankruptcy Code section 364(c)(1) with priority over all other administrative expenses pursuant to the Bankruptcy Code (including the kinds specified in or arising or ordered pursuant to Bankruptcy Code sections 326, 330, 331, 503(a) and (b), 506(b) and (c), 507(a), 507(b), and 726 thereof or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment), which superpriority expenses of the DIP Agent and DIP Lender shall be subject and subordinate only to the Carve-Out (the "<u>DIP Superpriority Claims</u>") which shall be against each of the Debtor's estates on a joint and several basis.<br><br>b.  Pursuant to Bankruptcy Code section 364(d)(1) (the "<u>Section 364(d)(1) Liens</u>"), the DIP Liens include (I) first priority liens upon and security interest in (a) all Accounts and payment intangibles, (b) Inventory and Documents for any Inventory, and (C) all Intellectual Property and related assets, and (II) on all assets of the Debtors and their Estates (the "<u>DIP Collateral</u>") of any nature whatsoever and wherever located, whether first arising prior to or following the Petition Date, now owned or hereafter acquired, including all accounts, all chattel paper, all commercial tort claims, all deposit accounts, all Avoidance Actions (defined below) and the proceeds thereof, all documents, all equipment, all general intangibles, all goods, all instruments, all inventory, all investment property, all letter-of-credit rights, all books and records, and all proceeds, profits, and offspring of the foregoing (including Cash Collateral (as that term is defined in Bankruptcy Code section 363)), which Section 364(d)(1) Liens shall be senior to any existing liens or |

| | |
|---|---|
| | claims, subject and subordinate only to the Carve-Out. |
| | c.   A first priority security interest and lien pursuant to Bankruptcy Code section 364(c)(2) on all unencumbered property of the Debtors and the Estates (the "Section 364(c)(2) Liens"), which Section 364(c)(2) Liens shall be subject and subordinate only to the Carve-Out. |
| **DIP Facility Availability:** | During the period commencing on the date (the "Interim Order Entry Date") of the Bankruptcy Court's entry of an interim order approving the DIP Facility (the "Interim Order" and any final order, the "Final Order" and the Interim Order and the Final Order together "Financing Orders") approving the DIP Facility, and ending on the date the Bankruptcy Court enters the Final Order (the "Interim Period"), $1,000,000 of the DIP Facility shall be available to the Borrowers through a one-time funding request, subject to (i) delivery by the Borrowers of a Budget in form and substance reasonably acceptable to the DIP Lender and (ii) compliance with the terms, conditions and covenants in the DIP Credit Agreement described in this Summary of Terms and Conditions (this "DIP Term Sheet").<br><br>Upon the Bankruptcy Court's entry of the Final Order, the full remaining amount of the Commitment shall be available to the Borrowers through a second draw, subject to compliance with the terms, conditions and covenants described in the DIP Financing Documents. |
| **Budget:** | As used in this DIP Term Sheet "Budget" means in the case of the initial Budget, a 13-week statement of sources and uses of the Borrowers broken down by week, including the anticipated uses of the DIP Facility for such period. The Budget shall provide, among other things, for the payment of fees and expenses relating to the DIP Facility, ordinary course administrative expenses, bankruptcy-related expenses and professional fees, working capital expenditures, and other general corporate needs. |
| **Maturity:** | The maturity date of the DIP Facility will be (and all loans and obligations under the DIP Facility shall be repaid in full in cash on) the earliest of: (i) stated maturity, which shall be first Business Day on or after ninety days (90) after the Petition Date, (ii) the effective date of any Chapter 11 plan of the Borrowers that is reasonably acceptable to the DIP Lender, (iii) the date that is 30 days after the Interim Order Entry Date if the Final Order shall not have been entered by such date, (iv) entry of an order converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code or dismissing any of the Chapter 11 Cases; (v) the closing of a sale of substantially all of the Debtors' assets and (vi) the acceleration of the loans or termination of the commitments under the DIP Facility, including, without limitation, as a result of the occurrence of an Event of Default (as defined below) (any such occurrence, the "Maturity Date").<br><br>Any confirmation or sale order entered in the Chapter 11 Cases shall be reasonably acceptable to the DIP Lender and shall not discharge or otherwise affect in any way any of the joint and several obligations of the Borrowers to the DIP Lender under the DIP Facility and DIP Credit Agreement, other than |

| | |
|---|---|
| | after the indefeasible payment in full in cash of such obligations unless the DIP Lender affirmatively agrees to different treatment. |
| **Interest Rate and Fees:** | The DIP Loans shall bear interest on the unpaid principal amount thereof plus all obligations owing to, and rights of, the DIP Lender pursuant to the DIP Credit Agreement, including without limitation, all interest, fees, and costs accruing thereon (collectively, the "Obligations") from the date of the entry of the Interim Order to and including the Maturity Date, at an annual interest rate of 15% to be paid monthly on the first (1st) business day of each month.<br><br>Upon entry of the Interim Order, the Debtors shall be obligated to pay from the proceeds of the DIP Loan:<br><br>• Commitment Fee of 2% of the full DIP Facility amount, earned and payable in cash at time of commitment;<br><br>• Funding Fee of 2% of the DIP Facility amount, earned and payable in cash as drawn.<br><br>In addition, the Debtors shall be obligated to pay an Exit Fee of 5% of the DIP Facility amount, earned and payable in cash upon the Maturity Date or upon the Prepayment of the DIP Loan.<br><br>Borrowers shall pay or reimburse the DIP Lender for all of its reasonable costs and expenses incurred in connection with the collection or enforcement of or preservation of any rights under the DIP Credit Agreement, including, without limitation, the fees and disbursements of counsel for the DIP Agent, including attorneys' fees out of court, in trial, on appeal, in bankruptcy proceedings, or otherwise.<br><br>In addition to any adequate protection afforded to the DIP Lender, Borrowers shall pay a non-refundable work fee of $100,000 to DIP Lender's attorney upon entry of the Interim Order (the "Work Fee"). |
| **Voluntary Prepayment:** | The DIP Loans may be prepaid in whole or in part at any time subject to the Exit Fee of 5% stated above. To the extent the Debtors sell all or substantially all of their assets prior to the Maturity Date, the DIP Lender will be entitled a payment equal (i) to the amount of accrued interest under the DIP Loan that would have accrued over the full 90 day period less any actual interest payments received or (ii) any break-up fee or expense reimbursement awarded to the DIP Lender should such lender serve as a stalking horse bidder in a sale process (the "Applicable Premium"). The DIP Lender may apply any such prepayments and any payments made thereunder in any order of priority determined by the DIP Lender in its exclusive judgment. |
| **Adequate Protection:** | Pursuant to sections 361, 363(e) and 364(d)(1) of the Bankruptcy Code, Hillair Capital Management LLC (the "Agent") and the secured parties (collectively, the "Prepetition Secured Parties") named in the Securities Purchase Agreement dated as of July 26, 2016 by and between Soupman Inc., and each purchaser named therein pursuant to which the Debtor issued the 8% Senior Secured |

Original Issue Discount Convertible Debentures due 2018 (the "Prepetition Purchase Agreement" and together with all other loan documents, the "Prepetition Securities Documents"), shall be granted the following adequate protection (collectively, the "Adequate Protection") to as protection for interests in the prepetition collateral as set forth in the Prepetition Securities Documents (the "Prepetition Collateral") in an amount equal to the Diminution in Value (each such diminution, a "Diminution in Value") of the security interests calculated in accordance with section 506(a) of the Bankruptcy Code, whether or not such Diminution in Value results from the sale, lease or use by the Borrowers of the Collateral or the stay of enforcement of any prepetition security interest arising from section 362 of the Bankruptcy Code, or otherwise, subject and subordinate to the Carve-Out, the DIP Liens and DIP Super-Priority Claims:

    a.    Adequate Protection Liens. As security for and solely to the extent of any Diminution in Value, the Agent, for the benefit of the Prepetition Secured Parties will be granted, valid, binding, enforceable non-avoidable, and automatically perfected junior postpetition security interests in and liens on the DIP Collateral, including Cash Collateral and the proceeds thereof (the "Adequate Protection Liens"). The Adequate Protection Liens shall be junior only to the DIP Liens and the Carve Out.

    b.    Superpriority Claims. As security for and solely to the extent of any Diminution in Value, the Agent, for the benefit of the Prepetition Secured Parties, will be granted, as and to the extent provided by sections 503(b) and 507(b) of the Bankruptcy Code, a separate allowed superiority administrative claim in the Chapter 11 Cases (the "Adequate Protection Superpriority Claims"); provided however that the Adequate Protection Superpriority Claims remain subject to and junior to, the Carve-Out, the DIP Superpriority Claims.

The Agent on behalf of the Prepetition Secured Parties shall provide a waiver and shall not object to the terms of DIP Credit Agreement, the Interim Order or the Final Order.

Fees and Expenses: As additional adequate protection, the Debtors shall pay in cash, the reasonable and documented professional fees, expenses and disbursements of the Agent in an amount no greater than $30,000 upon the Maturity Date.

| | |
|---|---|
| **Affirmative Covenants:** | So long as the DIP Loans remain unpaid (other than contingent obligations for which no claim has been made), the Borrowers shall comply with each of the following covenants, unless the DIP Agent shall otherwise consent in writing<br><br>    a.    Government Compliance. Except as permitted by the DIP Credit Agreement, each Borrower shall maintain its and all its Subsidiaries' legal existence and good standing in their respective jurisdictions of formation and maintain qualification in each jurisdiction in which the failure to so qualify would reasonably be expected to result in a Material Adverse Change. The Borrowers shall comply, and have |

each of their Subsidiaries comply, with all laws, ordinances and regulations to which it is subject, the noncompliance with which would reasonably be expected to result in a Material Adverse Change.

b.  Financial Statements, Reports, Certificates. The Borrowers shall provide the DIP Lender within three (3) Business Days after the end of each week, a reconciliation, in form and substance acceptable to the DIP Lender and substantially consistent with the Budget, of the actual cash receipts and disbursements of the Borrowers under DIP Credit Agreement for such week to the budgeted line item amounts set forth in the Budget for such week. The Borrowers shall further provide prompt written notice of the occurrence of any Default or Event of Default and the action(s) the Borrowers propose to take to remedy such Default or Event of Default.

c.  Compliance with Budget. Borrower shall at all times comply with the Budget, subject to the variances permitted under the DIP Credit Agreement and Interim and Final Orders.

d.  Taxes; Pensions. The Borrowers shall make, and cause each of their Subsidiaries to make, timely payment of all material post-petition foreign, federal, state and local taxes or assessments (except as where the same are being contested in good faith by appropriate proceedings and for which Borrowers have set aside on its books adequate reserves in accordance with GAAP), and shall deliver to the DIP Agent, on demand, appropriate certificates attesting to such payments, and pay all amounts necessary to fund all present pension, profit sharing and deferred compensation plans in accordance with their terms.

e.  Access to Collateral; Books and Records. At all reasonable times the DIP Agent, or its agents, shall have the right to inspect the Collateral and the right to audit and copy Borrowers' Books.

f.  Insurance. Each Borrower shall keep its business and the Collateral insured for risks and in amounts standard for companies in such Borrower's industry and location. Insurance policies shall be in a form, with companies, and in amounts that are reasonably satisfactory to the DIP Agent, it being agreed that the insurance maintained by Borrowers as of the Effective Date is satisfactory. All property policies shall have a lender's loss payable endorsement. All policies (or the loss payable and additional insured endorsements) shall provide that the insurer must give the DIP Agent at least thirty (30) days' notice before canceling, amending, or declining to renew its policy. Notwithstanding the foregoing, (a) so long as no Event of Default has occurred and is continuing, the Borrowers shall have the option of applying the proceeds of any casualty policy toward the replacement or repair of destroyed or damaged property; *provided* that any such replaced or repaired property (i) shall be of equal or like value as the replaced or repaired Collateral and (ii) shall be

deemed Collateral in which the DIP Agent has been granted a first priority security interest, and (b) after the occurrence and during the continuance of an Event of Default, all proceeds payable under such casualty policy shall, at the option of the DIP Agent, be payable to DIP Agent on account of the Obligations.

g.  Operating Accounts. The Borrower's shall provide the DIP Agent ten (10) Business Days' prior written notice before establishing any Collateral Account. In addition, for each Collateral Account that a Borrower at any time maintains, such Borrower shall, if requested by the DIP Agent, cause the applicable bank or financial institution at or with which any Collateral Account is maintained to execute and deliver a Control Agreement or other appropriate instrument with respect to such Collateral Account to perfect the Lender's Lien in such Collateral Account in accordance with the terms hereunder. The provisions of the previous sentence shall not apply to deposit accounts (i) that are fiduciary accounts or are exclusively used for payroll, payroll taxes and other employee wage and benefit payments to or for the benefit of a Borrower's employees, and (ii) to the extent the aggregate average daily balance held in such account does not exceed $10,000.

h.  Protection of Intellectual Property Rights. Each Borrower shall use commercially reasonable efforts to: (a) protect, defend and maintain the validity and enforceability of its intellectual property material to its business; (b) promptly advise the DIP Agent in writing of material infringements of its intellectual property; and (c) not allow any intellectual property material to such Borrower's business to be abandoned, forfeited or dedicated to the public without the Lender's written consent, which consent shall not be unreasonably withheld or delayed.

i.  Litigation Cooperation. From entry of the Interim Order and continuing through the termination of this Agreement, the Borrowers shall make available to the DIP Agent during regular business hours and upon reasonable prior notice, without expense to the DIP Agent, the Borrowers and their officers, employees and agents and the Borrowers' books and records, to the extent that the DIP Agent may deem them reasonably necessary to prosecute or defend any third-party suit or proceeding instituted by or against the DIP Agent with respect to any Collateral or relating to the Borrowers.

j.  Further Assurances. The Borrowers shall execute any further instruments and take further action as the DIP Agent reasonably requests to perfect or continue DIP Lender's security interest in the DIP Collateral or to effect the purposes of the DIP Credit Agreement

k.  Chapter 11 Milestones.

(i) Within (10) days of the Petition Date, file a motion (the "Sale Motion") to sell substantially all of the Debtors' assets, which Sale

| | |
|---|---|
| | Motion shall be in form and substance acceptable to the DIP Lender;<br><br>(ii) Within (10) days of the Petition Date, file a motion in form an substance acceptable to the DIP Lender, to approve bidding procedures for the sale (the "Bid Procedures");<br><br>(iii) No later than thirty-one (31) days after the Petition Date, obtain an order of the Bankruptcy Court in form and substance acceptable to the DIP Lender, approving the Bid Procedures;<br><br>(iv) No later than twenty-one (21) days after the Petition Date, deliver Schedules to the DIP Lender;<br><br>(v) No later thirty (30) days after the Petition Date, file schedules of assets and liabilities and statements of financial affairs for the Debtors;<br><br>(vi) No later than thirty (30) days after the Petition Date, obtain entry of the Final Order in form and substance acceptable to the DIP Lender;<br><br>(vii) No later than eighty (80) days after the Petition Date, commence and conclude an auction pursuant to the Bid Procedures;<br><br>(viii) No later than ninety (90) days of the Petition Date, obtain entry of an order of the Bankruptcy Court in form and substance acceptable to the DIP Lender, approving the sale;<br><br>(ix) No later than ninety (90) days after the Petition Date, close the sale of pursuant to the Bid Procedures and (a) indefeasibly and finally pay the DIP Obligations and all other obligations to the DIP Lender in full in cash at the closing of the sale or (b) convey the DIP Collateral pursuant to credit bid, in the event the DIP Lender elect to credit bid. |
| **Events of Default:** | Any one of the following shall constitute an event of default (an "Event of Default") under the DIP Credit Agreement:<br><br>a.   The Borrowers shall fail to comply with any of the Chapter 11 Milestones;<br><br>b.   The Borrowers shall fail to pay any Obligations to the DIP Lender as and when due, including, but not limited to, any adequate protection obligations;<br><br>c.   The Borrowers fail to file a plan of reorganization and accompanying disclosure statement reasonably acceptable to the DIP Lender by September 15, 2017;<br><br>d.   The Borrowers shall fail to perform, or otherwise breach, any covenant or agreement of the Borrowers contained in the DIP Credit Agreement, which failure or breach shall continue for ten (10) days after the date upon which Borrowers have received a written notice of such failure or breach from the Lender;<br><br>e.   Any representation or warranty made by a Borrower in the DIP Credit Agreement or by a Borrower (or any of its Officers) in any |

59051681.1

agreement, certificate, instrument or financial statement or other statement delivered to the DIP Agent pursuant to or in connection with the DIP Credit Agreement shall prove to have been incorrect in any material respect when made or deemed made;

f.   The rendering against a Borrower of a final non-appealable arbitration award, judgment, decree or order for the payment of money in excess of $100,000 (excluding amounts covered by insurance to the extent the relevant independent third-party insurer has not denied coverage therefor), and the same shall remain unsatisfied, unvacated and unstayed pending appeal for a period of thirty (30) consecutive days after the entry thereof;

g.   The Borrowers (except following the DIP Agent's prior written request or with the DIP Agent's express prior written consent) shall file a motion with the Bankruptcy Court or any other court with jurisdiction in the matter seeking an order, or an order is otherwise entered, modifying, reversing, revoking, staying, rescinding, vacating, or amending the Financing Orders or any of the Loan Documents, without the DIP Lender's express prior written consent (and no such consent shall be implied from any other action, inaction, or acquiescence of the Lender);

h.   The Borrower shall file any motion or application, or the Bankruptcy Court allows the motion or application of any other Person, which seeks approval for or allowance of any claim, lien, security interest ranking equal or senior in priority to the claims, liens and security interests granted to the DIP Lender under the Financing Orders or the Loan Documents or any such equal or prior claim, lien, or security interest shall be established in any manner, except, in any case, as expressly permitted under the Financing Orders;

i.   The Financing Orders shall cease to be in full force and effect from and after the date of entry thereof by the Bankruptcy Court;

j.   The occurrence of any default or event of default under the Financing Orders;

k.   The entry of an order which provides relief from the automatic stay otherwise imposed pursuant to Section 362 of the Bankruptcy Code, which order permits any creditor, other than the DIP Agent, to realize upon, or to exercise any right or remedy with respect to, any asset of the Borrowers or to terminate any license, franchise, or similar agreement, where such termination would reasonably be expected to result in a material adverse change;

l.   If any creditor of the Borrowers receives any adequate protection payment which is not fully acceptable to the DIP Agent in its sole discretion, or any Lien is granted as adequate protection other than as set forth in the Financing Orders;

| | |
|---|---|
| | m. Conversion of any of the Chapter 11 Cases to a Chapter 7 case under the Bankruptcy Code, or dismissal of any of the Chapter 11 Cases or any subsequent Chapter 7 case either voluntarily or involuntarily; |
| | n. The Interim Order or Final Order are modified, reversed, revoked, remanded, stayed, rescinded, vacated or amended on appeal or by the Bankruptcy Court without the prior written consent of DIP Agent (and no such consent shall be implied from any other authorization or acquiescence by DIP Lender); |
| | o. An examiner with special powers is appointed pursuant to Section 1104(a) of the Bankruptcy Code; or |
| | p. Non adherence with the Budget except to the extent of any Permitted Variance. |
| **Indemnity; Expenses:** | The Borrowers agree to indemnify, defend and hold the DIP Agent and the DIP Lender, and its respective directors, officers, employees, agents, attorneys, or any other Person affiliated with or representing the DIP Agent or DIP Lender harmless against: (a) all obligations, demands, claims, and liabilities (collectively, "Claims") asserted by any other party in connection with the transactions contemplated by the Loan Documents; and (b) all losses or expenses incurred, or paid by the DIP Agent or DIP Lender from, following, or arising from the transactions contemplated by the DIP Credit Agreement (including reasonable attorneys' fees and expenses), except for Claims and/or losses directly caused by the Lender's gross negligence or willful misconduct. |
| **Carve-Out:** | "Carve-Out" shall mean the sum of: (i) all budgeted fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under 28 U.S.C. § 1930(a); (ii) fees and expenses up to $25,000 incurred by a trustee under Bankruptcy Code section 726(b); (iii) all accrued but unpaid costs, fees, and expenses (the "Professional Fees") incurred by persons or firms retained by the Debtors pursuant to sections 327, 328, or 363 of the Bankruptcy Code (collectively, the "Debtor Professionals") and any official committee appointed in these Cases, including the Creditors' Committee (the "Committee Professionals" and the Debtor Professionals, collectively, the "Professional Persons") at any time before or on the first business day following delivery by the DIP Lender of a Carve-Out Trigger Notice, to the extent allowed at any time whether allowed by interim order, procedural order, or otherwise (the "Pre-Termination Amount"), subject to and in accordance with the Budget (which Budget line items shall not be subject to any variance); and (iv) after the first business day following delivery by the DIP Lender of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise, the payment of Professional Fees of Professional Persons in an aggregate amount not to exceed $125,000 with respect to the Debtor Professionals and the Committee Professionals (the "Post-Termination Amount," and together with the Pre-Termination Amount, the "Professional Fees Amount"); provided that nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, |

59051681.1

| | |
|---|---|
| | reimbursement, or compensation described in preceding clauses (iii) and (iv). |
| | For purposes of the foregoing, "<u>Carve-Out Trigger Notice</u>" shall mean a written notice delivered by the DIP Lender to the Debtors and their lead counsel, the U.S. Trustee, and lead counsel to the Creditors' Committee, if any, providing notice that the Termination Date has occurred. On the day on which a Carve-Out Trigger Notice is given to the Debtors, such Carve-Out Trigger Notice shall constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an aggregate amount equal to (A) the Pre-Termination Amount *plus* (B) the Post-Termination Amount, and the Debtors shall deposit and hold any such amounts in a segregated account in trust for the Professional Persons (the "<u>Professional Fees Reserve</u>") (it being understood that the Prepetition Secured Parties shall have a lien and security interest in any residual amount of such segregated account).  For purposes of the foregoing, "Termination Date" shall mean the date on which the DIP Lender or the DIP Agent, as applicable, have the right to terminate their obligations under the DIP Facility due to, among other things, an uncured Event of Default or Maturity of the DIP Loan. |
| | With respect to the fee (the "<u>Success Fee</u>") owed to Wyse Advisors, LLC pursuant to section 4(a)(i) of the engagement letter, dated May 25, 2017, and executed by Jamie Karson and Michael Wyse, the DIP Lender agrees that (a) if the DIP Lender credit bids the obligations owed under the DIP Loan and acquires substantially all of the Debtors' assets, and (b) there are no cash proceeds available to pay the Success Fee, the DIP Lender agrees to pay $150,000, subject to Bankruptcy Court approval. |
| | The Carve-Out shall be reduced by the payment of Professional Fees allowed at any time by the Bankruptcy Court. For the avoidance of doubt the Carve-Out shall be senior to all liens and claims securing the DIP Loan Documents and the Adequate Protection Superpriority Claims. |
| **Governing Law and Jurisdiction:** | The DIP Credit Agreement will provide that the Borrowers will submit to the exclusive jurisdiction and venue of the Bankruptcy Court, or in the event that the Bankruptcy Court does not have or does not exercise jurisdiction, then in any state or federal court of competent jurisdiction in the state, county and city of New York, borough of Manhattan; and shall waive any right to trial by jury. New York law shall govern the DIP Credit Agreement. |

**B.        Highlighted Provisions Under Bankruptcy Rule 4001 and Local Rule 4001-2.**

        **a.        Bankruptcy Rule 4001**

17.        The provisions described in Bankruptcy Rule 4001(b)(1)(B)(i)-(iv), to the extent

applicable, are set out at the following sections of the Interim Order:

59051681.1

- Name of Each Entity with an Interest in the Cash Collateral: Interim Order ¶¶ I, J

- Purpose for the Use of Cash Collateral: Interim Order ¶ I

- Material Terms, Including Duration, of the Use of Cash Collateral: DIP Term Sheet (Purpose, Maturity, Affirmative Covenants)

- Any Liens, Cash Payments, or Other Adequate Protection for Cash Collateral: Interim Order ¶ 19

18.     The provisions described in Bankruptcy Rule 4001(c)(1)(B)(i)-(xi), to the extent

applicable, are set out at the following sections of the Interim Order:

- Grant of Priority or a Lien on Property of the Estate Under Section 364(c) or (d): Interim Order ¶¶ 9, 15, 20

- Adequate Protection or Priority for a Claim that Arose before the Commencement of the Case, or the Use of Credit Obtained under § 364 to Make Cash Payments on Account of the Claim: Interim Order ¶ 20

- Determination of Validity, Enforceability, Priority, or Amount of a Claim that Arose Before the Commencement of the Case. None

- Waiver or Modification of the Automatic Stay: Interim Order ¶ 22

- Waiver or Modification of Authority to File a Plan, Seek an Extension of Exclusivity, Request Use of Cash Collateral, or Request Authority to Obtain Credit: DIP Term Sheet

- Establishment of Deadlines for Filing a Plan of Reorganization, for Approval of a Disclosure Statement, for a Hearing on Confirmation or Entry of a Confirmation Order: DIP Term Sheet

- Waiver or Modification of Applicability of Non-Bankruptcy Law Relating to the Perfection of a Lien on Property of the Estate, or on the Foreclosure or Other Enforcement of the Lien: Interim Order ¶ 2

- Release, Waiver, or Limitation on Any Claim or Cause of Action Belonging to the Estate: None

- Indemnification of Any Entity: Interim Order ¶ 7

- Release, Waiver, or Limitation on Rights Under Section 506(c): Interim ¶ 12

- Liens Granted on Claims Arising Under Chapters 5 or 7: Interim Order ¶ 10

59051681.1

### b.    Local Rule 4001-2

19.    Local Bankruptcy Rule 4001-2 requires that certain provisions contained in the DIP Orders or the DIP Term Sheet be highlighted and that the Debtor provides justification for the inclusion of such highlighted provisions:

| Local Rule | Provision in DIP Term Sheet, Interim Order, or Final Order |
|---|---|
| Rule 4001-2(a)(i)(A) – Cross-collateralization | None |
| Rule 4001-2(a)(i)(B) – Waiver of claims against prepetition secured creditors | None |
| Rule 4001-2(a)(i)(C) – Waiver of 506(c) rights | Interim Order ¶ 12 |
| Rule 4001-2(a)(i)(D) – Lines on avoidance actions | Interim Order ¶ 10 |
| Rule 4001-2(a)(i)(E) – Payment of prepetition debt with post-petition debt | None |
| Rule 4001-2(a)(i)(F) – Disparate treatment of estate professionals | None |
| Rule 4001-2(a)(i)(G) – Prime without consent | None |
| Rule 4001-2(a)(i)(H) – Equities of the case | None |

## Basis for Relief Requested

20.    The preservation of the value of the Debtors' business and the success of the timing of the Debtors' reorganization efforts hinge on obtaining access to sufficient postpetition financing. The Debtors' ability to conduct a potential sale depends heavily upon the immediate approval of this Motion. The Debtors' request authorization to obtain funding under the DIP Loan pursuant to the DIP Term Sheet and to use the Cash Collateral. The Debtors intend to use these funds to, among other things, fund its operations and to explore the potential sale of all or substantially all of its assets.

## I.    The Debtors Should be Authorized to Obtain Postpetition Financing Through the DIP Term Sheet

21.    As set forth above, the DIP Loan and the Cash Collateral are the only financing

available in an amount and under the terms required by the Debtors at this time. The Debtors have been unable to procure sufficient financing: (a) in the form of unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code; (b) solely as an administrative expense under section 364(a) and (b) of the Bankruptcy Code; or (c) in exchange for the grant of a superpriority administrative expense claim pursuant to section 364(c) of the Bankruptcy Code. Thus, based on the foregoing and for the reasons set forth below, the Debtors submit that it has satisfied the requirement to access postpetition financing on a superpriority, secured basis pursuant to section 364 of the Bankruptcy Code, and their proposed grant of adequate protection to the Prepetition Lenders is appropriate.

**A.    Entry into the DIP Term Sheet is an Exercise of the Debtors' Sound Business Judgment**

22.    The Court should authorize the Debtors, as an exercise of its sound business judgment, to enter into the DIP Term Sheet, obtain access to the DIP Loan, and continue using the Cash Collateral. Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances discussed in detail below. Courts grant a debtor-in-possession considerable deference in acting in accordance with its business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.  In re Trans World Airlines, Inc., 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); In re L.A. Dodgers LLC, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection ofthe lender."); In re Ames Dept. Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business

judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest").

23.    Specifically, to determine whether the business judgment standard is met, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." In re Exide Techs., 340 B.R. 222, 239 (Bankr. D. Del. 2006); see In re Curlew Valley Assocs., 14 B.R. 506, 513-14 (Bankr. D. Utah 1981) (noting that courts should not second guess a Debtors' business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the Debtors'] authority under the [Bankruptcy] Code"). As part of this inquiry, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. In re Farmland Indus., Inc., 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); see Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.), 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).  And a court may also appropriately take into consideration non-economic benefits to the Debtor offered by a proposed postpetition facility. For example, in In re ION Media Networks, Inc., the bankruptcy court for the Southern District of New York stated:

> Although all parties, include the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain creditor from a particular lender is almost never based purely on economic terms.  *Relevant features of the financing must be evaluated, including non economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization.*

No. 09-13125, 2009 WL 29025677, at *4 (Bankr. S.D.N.Y. July 6, 2009) (emphasis added).

24.    The Debtors' determination to move forward with the DIP Loan is an exercise of their sound business judgment following an arm's-length process and careful evaluation of

alternatives. Specifically, and in the face of insufficient cash on hand, the Debtors and their advisors determined that the Debtors would require significant postpetition financing to support their operational and chapter 11 activities. The Debtors negotiated the DIP Term Sheet with the DIP Lender in good faith, at arm's-length, and with the assistance of their respective advisors, and the Debtors believe that they have obtained the best financing available. Accordingly, the Court should authorize the Debtors' entry into the DIP Term Sheet, as it is a reasonable exercise of the Debtors' business judgment.

**B.      The Debtor Should be Authorized to Grant Liens and Superpriority Claims**

25.      The Debtors propose to obtain financing under the DIP Loan by providing security interests and liens as set forth in the DIP Term Sheet pursuant to sections 364(c) and (d) of the Bankruptcy Code; specifically, the Debtor proposes to provide to the DIP Lender perfected first priority claims, priming liens, and security interests in the Collateral.

26.      The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and hearing, that a Debtor are "unable to obtain unsecured credit allowable under Section 503(b)(1) of [the Bankruptcy Code]." 11 U.S.C. § 364(c). In re Crouse Grp., Inc., 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).  Courts have articulated a three-part test to determine whether a Debtor are entitled to financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether:

- the Debtor are unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, *i.e.*, by allowing a lender only an administrative expense claim;

- the credit transaction is necessary to preserve the assets of the estate; and

- the terms of the transaction are fair, reasonable, and adequate, given the

22

59051681.1

circumstances of the debtor-borrower and proposed lenders.

Ames Dep't Stores, 115 B.R. 34, 37-40 (Bankr. S.D.N.Y. 1990); In re St. Mary Hosp., 86 B.R. 401-02 (Bankr. E.D. Pa. 1998); Crouse Grp., 71 B.R. at 549.

27.    The Debtors are in need of an immediate capital infusion, yet current market conditions are challenging. Without postpetition financing, the Debtors lack sufficient funds to operate their business, continue paying debts as they come due, or cover the projected costs of the Chapter 11 Cases. Absent the DIP Loan, which will allow the Debtors to meet their working capital needs during the Chapter 11 Cases and potentially consummate a proposed sale of substantially all of the Debtors' assets, the value of the Debtors' estates would be significantly impaired to the detriment of all stakeholders. Given the Debtors' circumstances, the Debtors believe that the terms of the DIP Loan, as set forth in the DIP Term Sheet and the Interim Order are fair, reasonable, and adequate. For all these reasons, the Debtors submit that it has met the standard for obtaining secured postpetition financing.

28.    In the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) provides that a court "may authorize the obtaining of credit or the incurring of debt (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien." As described above, the Debtors are unable to obtain unsecured credit. Therefore, approving a superpriority claim in favor of the DIP Lender is reasonable and appropriate.

29.    Further, section 364(d) provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of

the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1). Consent by the secured creditors to priming obviates the need to show adequate protection. See Anchor Savs. Bank FSB v. Sky Valley, Inc., 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected."). Accordingly, the Debtors may incur "priming" liens under the DIP Loan if either (a) the Prepetition Lenders consented or (b) the Prepetition Lenders' interests in their respective collateral are adequately protected.

30.     Here, the Prepetition Lenders have consented to the DIP Loan and their interests in their respective collateral are adequately protected. Therefore, the relief requested pursuant to section 364(d)(1) of the Bankruptcy Code is appropriate.

**C.     No Comparable Alternative to the DIP Loan is Reasonably Available**

31.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code. In re Snowshoe Co., Inc., 789 F.2d 1085, 1088 (4th Cir. 1986); see In re Plabell Rubber Prods., Inc., 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992). Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd, 99 B.R. 117; see Snowshoe, 789 F.2d at 1088 (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); In re Stanley Hotel, Inc., 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); Ames Dep't Stores, 115 B.R. at 37-39 (debtor

must show that it made reasonable efforts to seek other sources financing section 364(a) and (b)).

32.     As noted above, the Debtors do not believe that alternative sources of financing are reasonably available given the realities imposed by the Debtors' existing capital structure. The Debtors' Prepetition Lenders assert that all of the Debtors' existing assets are encumbered under the Debtors' existing capital structure. Thus, the Debtors have determined that the DIP Loan provides the best opportunity available to the Debtors to fund the Chapter 11 Cases. Therefore, in addition to evidence to be introduced at the hearing on the Interim Order if necessary, the Debtors submit that the requirement of section 364 of the Bankruptcy Code that alternative credit on more favorable terms be unavailable to the Debtor are satisfied.

### D.     The Debtor Should be Authorized to Use the Cash Collateral

33.     Section 363 of the Bankruptcy Code generally governs the use of estate property. Section 362(c)(2)(A) permits a debtor in possession to use cash collateral with the consent of the secured party. Here, the Prepetition Lenders consent to the Debtors' use of the Cash Collateral, subject to the terms and limitations set forth in the DIP Orders, including the adequate protection provisions provided to the Prepetition Lenders in these Orders.

34.     The adequate protection provided in the Orders for Prepetition Lenders is appropriate. Section 363(c) provides for adequate protection of interests in property when a debtor uses cash collateral. Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests of property due to the imposition of the automatic stay.   In re Cont'l Airlines, 91 F.3d 553, 556 (3d Cir. 1996 (en banc)). While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as getting replacement liens and administrative expense claims, courts decide what constitutes adequate protection on a case-by-case basis. In re Swedeland Dev. Grp., Inc., 16 F.3d 552, 564 (3d Cir. 1994); In re Satcon Tech. Corp., No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012); In re N.J.

Affordable Homes Corp., No. 05-60442 (DHS), 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006); In re Columbia Gas Sys., Inc., Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); see also In re Dynaco Corp., 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankr. ¶ 361.01[1] at 361-66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of such proceeding.")).

35.     As described more fully above, and as set forth in the DIP Orders, the Debtors propose to provide the Prepetition Lenders with valid and automatically perfected replacement liens to protect against the postpetition diminution in value of the Cash Collateral arising from the use, sale, or lease of the Cash Collateral by the Debtor and the imposition of the automatic. The Debtors submit that the proposed adequate protection is sufficient to protect the Prepetition Lenders from any diminution in value to the Cash Collateral, and are appropriate. Thus, the Debtors' provision of adequate protection is not only necessary to protect against any diminution in value, but is fair and appropriate under the circumstances of the Chapter 11 Cases to ensure the Debtors are able to continue using Cash Collateral, subject to the terms and limitations set forth in the Interim Order, for the benefit of all parties in interest and the Debtors' estates.

## II.     The DIP Lender Should be Deemed a Good-Faith Lender Under Section 364(e)

36.     Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under this section [of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such

authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

37. As explained in this Motion, the DIP Term Sheet are the result of: (a) the Debtors' reasonable and informed determination that the DIP Lender offered the most favorable terms on which to obtain vital postpetition financing and (b) extended arms'-length, good-faith negotiations between the Debtors and the DIP Lender. The Debtor submits that the terms and conditions of the DIP Term Sheet are reasonable and appropriate under the circumstances, and the proceeds of the DIP Loan will be used only for purposes that are permissible under the Bankruptcy Code. Further, no consideration is being provided to any party to the DIP Term Sheet other than as described in this Motion or in the DIP Term Sheet. Accordingly, the Court should find that the DIP Lender is "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded by that section.

## III. Approval of the DIP Loan on an Interim Basis is Necessary to Prevent Immediate and Irreparable Harm

38. Bankruptcy Rules 4001(b) an 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code or to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion. Upon request, however, the Court may conduct a preliminary, expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to the Debtors' estates. Also, to the extent that the Debtors are seeking authority to sell, use, or otherwise incur an obligation regarding property its estate, Bankruptcy Rule 6003 provides that the Court may only grant such relief to the extent it is necessary to avoid "immediate and irreparable harm." Fed. R. Bankr. P. 6003(b).

39. In examining requests for interim relief under the "immediate and irreparable harm" standard, courts apply the same business judgment standard applicable to other business

decisions. See, e.g., Ames Dep't Stores, 115 B.R. at 36.  After the 14-day period, the request for financing is not limited to those amounts necessary to prevent the destruction of the Debtors' business, and the Debtors are entitled to borrow those amounts that it believes are prudent to the operation of its business. Id.

40.    Immediate and irreparable harm would result if the relief requested in this Motion is not granted on an interim basis. As described above and in the First Day Declaration, the Debtors need to access liquidity under the DIP Loan in order to, among other things, satisfy its working capital and operational needs and preserve the going concern value of the Debtors' estates. Funding these expenditures is necessary to the Debtors' ability to preserve its value for the benefit of all parties in interest pending a potential sale of the Debtors' assets. Accordingly, under these circumstances, entry of the Interim Order is necessary to prevent immediate and irreparable harm to the Debtors' estates, and, therefore, is warranted under the requirements of the Bankruptcy Rules.

**Request for Final Hearing**

41.    Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, and in no event later than thirty (30) days after the Petition Date, and to fix the time and date prior to the Final Hearing for parties to file objection to this Motion.

**Request for Waiver of Stay**

42.    The Debtors further seek a waiver of any stay of the effectiveness of the Interim Order approving this Motion. Pursuant to Bankruptcy Rule 6004(h), "a[n] order authorizing the use, sale, or lease of a property other than cash collateral is stayed until the expiration of 10 days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). As set forth above, the DIP Loan is essential to prevent irreparable damage to the Debtors' operations

and potential to conduct sale of substantially all of its assets. Accordingly, the Debtors submit that ample cause exists to justify a waiver of the 10-day stay imposed by Bankruptcy Rule 6004(h), to the extent it applies.

### Notice

43.     The Debtors have provided notice of this Motion to: (a) the Office of the United States Trustee for the District of Delaware; (b) the entities listed on the Consolidated List of Creditors Holding the 20 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) Hillair Capital Investments, L.P.; (d) all parties with an alleged lien on the Debtors' assets; (e) the Internal Revenue Service; (f) the Securities and Exchange Commission; and (g) all parties entitled to notice pursuant to Local Rule 9013-1(m). The Debtors submit that, under the circumstances, no other or further notice is required.

44.     As this Motion is seeking "first-day" relief, within two business days of the hearing on this Motion, the Debtors will serve copies of this Motion and any order entered with respect to this Motion pursuant to Local Rule 9013-1(m).

45.     The Debtors respectfully submit that, in like of the nature of the relief requested and the circumstances, no other or further notice need be given.

### No Prior Request

46.     No prior request for the relief sought in this Motion has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court grant the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Dated: June 15, 2017  
Wilmington, Delaware

**POLSINELLI PC**

/s/ Jarrett Vine
Christopher A. Ward (Del Bar No. 3877)  
Jarrett Vine (Del. Bar No. 5400)  
222 Delaware Avenue, Suite 1101  
Wilmington, Delaware 19801  
T: (302) 252-0920  
F: (302) 252-0921  
cward@polsinelli.com  
jvine@polsinelli.com

-and-

Jeremy R. Johnson (*Pro Hac Vice Pending*)  
600 3rd Avenue, 42nd Floor  
New York, New York 10016  
T: (212) 684-0199  
F: (212) 684-0197  
jeremy.johnson@polsinelli.com

*Proposed Counsel for the Debtors and Debtors-In-Possession*

59051681.1