## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| THE ORIGINAL SOUPMAN, INC., *et al.*, | Case No. 17-11313 (LSS) |
| Debtors.[1] | Joint Administration Requested |

### DECLARATION IN SUPPORT OF PETITIONS AND FIRST DAY PLEADINGS

I, Michael Wyse, hereby declare under penalty of perjury:

1.       I am the interim Chief Financial Officer and Chief Restructuring Officer of The Original Soupman, Inc. and its affiliated debtors and debtors in possession (the "**Debtors**"), a corporation organized under the laws of the State of Delaware with its principal place of business in Staten Island, New York. I have been serving as interim CFO and CRO of the Debtors since May 25, 2017. I oversee the Debtors' business, including all financial functions, while leading the efforts to explore strategic alternatives for the Debtors.

2.       I am also the managing partner of Wyse Advisors, LLC, a boutique financial advisory firm with a primary focus on stressed, distressed and special situations, focusing on companies of various financial sizes and industries.

3.       I submit this declaration ("**Declaration**") in support of the Debtors' chapter 11 bankruptcy petition and in support of the Debtors' "first day" motions and applications, described in further detail below (collectively, the "**First Day Motions**").  I am over 18 years of age and am competent to make this Declaration and testify to the facts set forth herein.

---

[1] The Debtors, together with the last four digits of each Debtor's federal tax identification number, are: The Original Soupman, Inc. (0182); Soupman, Inc. (8630); and Kiosk Concepts, Inc. (4839).  The location of the Debtors' corporate headquarters and the service address for all Debtors is 1110 South Ave. Suite 100, Staten Island, NY 10314.

4.       I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records. Over the past several weeks, I have reviewed sales projections, financial statements, observed management in their daily business, and discussed the business with employees, the Debtor's counsel, its board of directors and suppliers. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with current and former officers and other members of the Debtors' management team, senior personnel, and advisors, my review of relevant documents and information concerning the Debtors' operations and financial affairs as well as the Debtors' books and records, or my opinions based upon my experience and knowledge. If called as a witness, to testify in this matter, I could and would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the Debtors.

5.       On June 13, 2017 (the "**Petition Date**"), the Debtors each filed a voluntary petition (the "**Petition**") for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**") commencing the above-captioned bankruptcy cases (the "**Chapter 11 Cases**"). It is anticipated that the Debtors will continue to manage their affairs and operate their business as debtors and debtors-in-possession pursuant and subject to the requirements of sections 1107(a) and 1108 of the Bankruptcy Code

6.       I am familiar with the contents of each First Day Motion (including the exhibits to such motions) and believe the relief sought in each First Day Motion will allow for an orderly transition of the Debtors into this Case and permit the Debtors to achieve its bankruptcy objectives as further described below.

7.      Part I of this Declaration describes the Debtors' business, capital structure, and the events leading to the filing of the Petition. Part II of this Declaration sets forth the First Day Motions[2] and sets forth the relevant facts in support of those motions.

## BACKGROUND

### History of the Debtors

8.      The Debtors business began business as a soup manufacturer in 2001. In 2004, the Debtors signed a license agreement with Yegan Food Inc. Yegan Food Inc. operated a soup restaurant since 1984 in New York located at 259-A West 55th Street in New York, run by Ali "Al" Yeganeh. This restaurant became a worldwide destination for soups, being rated #1 by Zagat and praised by the New York Times as "Art, not Soup." The fame of the business and its soup rose to even greater heights after a 1995 "Seinfeld" episode in which the irascible Soup Nazi berates customers who stand in long lines for his legendary soup, often yelling "No soup for you!"

9.      Since that time, the Debtors significantly expanded their reach and operations. The Debtors sell soups in 17-ounce Tetra Recart packaging to grocery chains and club stores throughout the United States, through on-line retailers, and in frozen 4 pound bulk packaging to its franchise restaurants and to the New York City School System.

### Debtors' Business Operations

10.      **Products** – The Debtors offers eight varieties of Tetra Recart soups to grocery and club stores and several more varieties of frozen bulk soups to its franchisees and to the New York City school system.

---

[2] Capitalized terms not defined herein have the meanings ascribed to them in the First Day Motions.

3

11.     **Suppliers –** The Debtors have no in-house manufacturing capabilities. Their products are manufactured to meet the Debtors' recipes and manufacturing by independent third-party manufacturers.

12.     **Distribution –** The Debtors' products are sold nationally through multiple channels, including through traditional retail locations and direct online sales to consumers. In the United States, the Debtors' products are primarily sold in approximately 6,500 grocery stores.

13.     **Franchise Restaurants** – The Debtors have six franchised stores bearing the "Soupman" name, either as a standalone concept or co-branded with another concept. The flagship store is the original store located at 259-A West 55th Street, New York, New York. Other stores are northeastern United States.

14.     **Employees -** As of June 12, 2017, the Debtors had a total of six employees, including five full-time and one part-time employee.

15.     **Facilities –** The Debtors' corporate headquarters is located in Staten Island, New York. The Staten Island location consists of 576 square feet of space under an office service license agreement that expired on March 31, 2017. Currently, the Debtors are on a month-to-month basis. In addition to the Debtors' headquarters, the Debtors rent commercial storage space for storage of soup, which is also on a monthly basis. The Debtors owns no real property. All utilities are paid through the Debtors' rental payments.

## Organizational Structure, Governance, and Current Management

16.     The Debtor-parent, Soupman, Inc., is a publically traded Delaware corporation on the OTCQB and primary obligor on the unsecured notes below. The Original Soupman, Inc. is a wholly-owned subsidiary of Soupman, Inc. and the operating entity of the Debtors, has all

the necessary licenses and owns all intellectual property to operate the business. Kiosk Concepts, Inc. is an 80% owned subsidiary of The Original Soupman, Inc., with the remaining 20% owned by Al Yeganeh, and was created to license the intellectual property to franchisees.

17.     The Debtors have a two member board of directors comprised of Jamieson Karson, its Chairman and CEO, and Ronald Crane, an independent third-party.  As stated above, in May, 2017 the Debtors appointed me the Chief Restructuring Officer and Interim Chief Financial Officer as part of a restructuring of its management team.

## Capital Structure

### Secured Debt

18.     The Debtors are liable to Hillair Capital Investments, L.P (the "**Prepetition Lender**") under the 8% Secured Notes Due April 1, 2018 (the "**2018 Notes**") and the 8% Secured Notes due February 22, 2017 (the "**2017 Notes**," collectively with the 2018 Notes, the "**Prepetition Obligations**"). The Debtors are in default of 2017 Notes and have entered into forbearance agreement with the Prepetition Secured Lenders on account of such default. The Prepetition Obligations are secured (the "**Prepetition Liens**") in all of the assets of the Debtors. As of the Petition Date, the amount of principal and interest outstanding under the 2018 Notes is $3,547,118 and the amount of principal and interest outstanding under the 2017 Notes is $121,472.

19.     On May 20, 2011, the Debtors entered into a Forbearance Agreement and Secured Guaranty with Penny Fern Hart ("**Hart**"). The Debtors subsequently defaulted and entered into a Settlement Agreement on October 9, 2015. The Hart Settlement Agreement and prior agreements were secured in all of the Debtors' assets. As of the Petition Date, the amount

of principal and interest outstanding under the Hart Settlement Agreement is $743,698.00. The Debtors are in default of the Hart Settlement Agreement.

20.    In connection with the funding from the Prepetition Lender, Hart executed a Subordination Agreement dated July 27, 2016 with the Prepetition Secured Lender (the "**Subordination Agreement**"). Pursuant to the Subordination Agreement, Hart subordinated only certain payments under the Settlement Agreement to the obligations of the Prepetition Lender. In any bankruptcy proceeding, however, the Subordination Agreement subordinates the Settlement Agreement obligations to the Prepetition Lender's obligations, transfers all of Hart's security or the proceeds thereof to the Prepetition Lender, and appoints the Prepetition Lender as Hart's attorney in fact.

21.    On January 26, 2017, the Debtors entered into a Merchant Agreement and Security Agreement and Guaranty ("**Platinum Factor Agreement'**) with Platinum Rapid Funding Group Ltd. ("**Platinum**") for the sale of $366,080.00 of the Debtors' accounts receivables ("**AR**") in exchange for a $256,000.00 payment from Platinum. The Platinum Factor Agreement grants Platinum a security interest in "all accounts, chattel paper, documents, equipment, general intangibles, instruments, and inventory." As of the Petition Date, the Debtors do not believe there are any amounts outstanding or any AR remaining subject to Rapid's security interest.

22.    On January 9, 2017, the Debtors entered into a Revenue Based Factoring Agreement and Security Agreement and Guaranty (the "**PowerUp Factor Agreement**") with PowerUp Lending Group, Ltd. ("**PowerUp**") for the sale of $135,000.00 of the Debtors' AR to PowerUp in exchange for a $100,000.00 payment from PowerUp. The PowerUp Factor granted PowerUp a security interest in the Debtors' "accounts, chattel paper, cash, deposit accounts,

6

documents, equipment, general intangibles, instruments, inventory, or investment property." As of the Petition Date, the Debtors owe approximately $53,598.00 in principal and interest under the PowerUp Factor Agreement.

Unsecured Notes

23.    The Debtors from time to time since 2012 issued unsecured notes (the "**Unsecured Notes**") to various individuals and organizations to fund the Debtors' operations. The Unsecured Notes carry interest rates ranging from 7% to 12%. As of the Petition Dates, the Debtors owe approximately $3,312,492.00 in principal and interest under the Unsecured Notes.

Cash Advances

24.    The Debtors received approximately $260,850 in unsecured cash advances from Platinum.

Trade Payables

25.    As of the Petition Date, the Debtors' accounts payables amounted to approximately $1,800,000.00.

Equity Interests

26.    As of the Petition Date, the Debtors have outstanding three series of preferred shares (the "**Preferred Stock**"). There are 878,639 shares outstanding of Series A Preferred Stock, 6,118,679 shares outstanding of Series B Preferred Stock, and 1,725,000 of Series C Preferred Stock.

27.    Each series of Preferred Stock was issued at a par value of $0.001, with a liquidation preference of $0.20, and the right into Common Stock (defined below) at a conversion price of $0.02. Further, the Preferred Stock votes together with the Common Stock in a single class on any matter presented for a vote of the Common Stock.

7

28.     As of the Petition Date, the Debtors have outstanding 288,845,379 common shares (the "**Common Stock**").

**Circumstances Leading to Chapter 11 Filing**

29.     The Debtors' current CEO, Jamieson Karson, joined the company as CEO in August, 2015. At that time, the Debtors had approximately $8 million in liabilities. In July 2016, the company received net loan proceeds of $3.5 million from the Prepetition Lender, bringing the total liabilities at that time to approximately $11 million. The Debtors used the net proceeds to purchase inventory, market and promote their products, and operate their business. That funding, however, was not enough to sustain the Debtors' operations long-term. Currently there are approximately $11.5 million in liabilities and $1.3 million in assets.

30.     In May 2017, the Debtors' then-Chief Financial Officer and President, Bob Bertrand, was indicted for failure to pay certain payroll and withholding taxes for the period 2010 to 2014. Mr. Bertrand has been suspended without pay pending the outcome. Mr. Wyse has succeeded Mr. Bertrand as Interim Chief Financial Officer. Mr. Bertrand's recent indictment has significantly impeded the Debtors' ability to secure further financing for their business. As a result, the Debtor cannot purchase inventory or pay its bills on a current basis. As such, the Debtors' exhaustion of existing financing and the limited interest from other financial providers necessitated the filing of the Chapter 11 Cases.

## FIRST DAY MOTIONS

31.     The Debtors filed the First Day Motions contemporaneously herewith to ensure that the Debtors' business continues to function during the Chapter 11 Cases. For the reasons set forth below, the relief requested in the First Day Motions is necessary to (i) stabilize the Debtors' business operations, (ii) operate with minimal disruption during the pendency of the Chapter 11

8

Cases, (iii) maintain value as a going concern, and (iv) facilitate the efficient and economical administration of the Chapter 11 Cases. A description of the relief requested and the facts supporting each of the First Day Motions is set forth below.[3]

## I.    Joint Administration Motion

32.    Given the integrated nature of the Debtors' operations, the Debtors believe that the joint administration of the Chapter 11 Cases will provide significant administrative convenience without prejudicing the substantive rights of any party in interest. Joint administration of the Chapter 11 Cases will reduce parties' fees and costs by avoiding duplicative filings and objections and make the most efficient use of the Court's resources and the resources of all parties in interest. Accordingly, joint administration of the Chapter 11 Cases is in the best interests of the Debtors, their estates and creditors, and all parties in interest.

## II.    Schedules And Statements Motion

33.    In the days leading up to the Petition Date, the Debtors' primary focus was preparing for these Chapter 11 Cases. As a result, the Debtors have not yet collected the information necessary to prepare the Schedules and Statements. To do so, the Debtors will have to compile information from books, records, and documents relating to claims, assets, and contracts from each Debtor entity. Collecting this information will require a significant expenditure of time and effort on the part of the Debtors and their respective employees.

34.    However, at this critical juncture, focusing the attention of key personnel on other critical aspects of the Chapter 11 Cases is necessary to allow each Debtor to transition into chapter 11 in a manner that maximizes value for their estates, their creditors, and other parties in interest. Accordingly, the Debtors believe that an extension of time to file the Schedules and

---

[3]    Capitalized terms used but not otherwise defined in this Section shall have the meanings ascribed to them in the applicable First Day Motion.

59055120.4

Statements by (i) 30 days or (ii) the date of the hearing on the sale of substantially all of the Debtors' assets, whichever is earlier, without prejudice to the Debtors' ability to request additional extensions, is appropriate and warranted under the circumstances. Such an extension will not harm creditors or other parties in interest because, even under the extended deadline, the Debtors will file the Schedules and Statements in advance of any deadline to file proofs of claim in the Chapter 11 Cases and in advance of any sale hearing.

**III.    Consolidated Creditors' List Motion and Waiver of Equity List**

35.    The Debtors currently maintain a computerized list of the names and addresses of each of their respective creditors that will be entitled to receive certain notices and other pleadings filed in the Chapter 11 Cases. The information contained in these computer files can be consolidated and used in an efficient manner to provide notices and other pleadings to parties in interest. As such, the Debtors believe that permitting the Debtors to file these lists in a consolidated form, identifying their creditors and equity security holders in substantially the same formats that are currently maintained by the Debtors in the ordinary course of business, is appropriate and warranted under the circumstances.

36.    The Debtors have identified approximately 90 entities to which notice of certain proceedings in the Chapter 11 Cases must be provided. Due to the number of creditors in the Chapter 11 Cases, the Debtors believe that filing a single consolidated list of their combined twenty (20) largest unsecured creditors in the Chapter 11 Cases would be more reflective of the body of unsecured creditors that have the greatest stake in these cases than separate lists for each of the Debtors.

37.    In addition, the Court should waive the Debtors' requirement to file a list of equity security holders. Debtor Soupman, Inc. ("**Soupman**"), is a public company, and as of May

31, 2017, had 288,845,379 outstanding common shares and 8,722,318 preferred shares. The remaining two Debtors are directly owned by Soupman. The Debtors submit that preparing the Equity List with last-known addresses and sending notices to all parties is unnecessary at this time and would create an additional expense without a concomitant benefit to the estates as there will be likely no recover to equity security holders. The Debtors further submit that to the extent equity security holders are entitled to distributions or entitled to vote on a chapter 11 plan, those parties can nevertheless be provided with the appropriate bar date or plan-related notices and then have an opportunity to assert their interests. Thus, equity security holders will not be prejudiced should they not receive copies of motions and notices on a routine basis.

## IV.    Administrative, Notice, and Claims Agent Applications

38.    Through two applications, the Debtors seek authority to employ and retain Epiq Bankruptcy Solutions, LLC ("**Epiq**") as the Debtors' claims and noticing agent during the Chapter 11 Cases and as an administrative advisor. Epiq is one of the country's leading chapter 11 administrators, with significant experience in noticing, claims administration, solicitation, balloting, and facilitating other administrative aspects of chapter 11 cases. Epiq has substantial experience providing services, including claims and noticing services, in matters comparable in size and complexity to the Debtors' Chapter 11 Cases. Because of the number geographic scope of the Debtors' creditors and other parties in interest, the Debtors require the claims and noticing services of Epiq. Further, because the Debtors are a small organization, with management inexperienced in bankruptcy, the Debtors require Epiq's advisory services to complete various bankruptcy tasks, including preparing the bankruptcy schedules and statement of financial affairs, and handling the administrative tasks in confirming a chapter 11 plan.

39.    Prior to the selection of Epiq as administrative, claims, and noticing agent, the Debtors obtained and reviewed engagement proposals from at three (3) other claims and noticing

11

agents to ensure selection through a competitive process. I believe, based on all engagement proposals obtained and reviewed, that Epiq's rates are competitive and reasonable given Epiq's quality of services and expertise.

40.    In view of the number of anticipated claimants and the complexity of the Debtors' business, I believe that the appointment of Epiq as claims and noticing agent is both necessary and in the best interests of the Debtors' estate and its creditors.

## V.    DIP Financing Motion

41.    Based on the 13-week cash flow, in order to stabilize the business, including buying much needed inventory to fulfill outstanding orders from customers, fund operating costs of the Debtors, as well as fund a sale process through a bankruptcy, it was determined that the Debtors' required debtor in possession financing of no less than $2,000,000.00. The Debtors, through their CRO and interim CFO, contacted approximately 75 parties to provide the requisite financing, of which approximately 35 parties signed non-disclosure agreements ("NDAs"). The Debtors provided all pertinent documents, including the 13-week cash flow and annual projections, to all parties that signed the NDA, as well as had numerous conversations with potential interested parties, some of which included conversation with senior management of the Debtors. Of those approximately 35 parties, only potential investor provided the Company with a Letter of Intent. Through further negotiation, that one party ultimately provided a commitment letter for DIP Financing.

42.    By the DIP Financing Motion, the Debtors request entry of interim and final orders, authorizing the Debtors to enter into a DIP Credit Agreement with Soupman Lending, LLC, in its capacity as DIP Lender. The DIP Facility consists of a $2,000,000 term loan with $1,00,000 available upon entry of an interim order approving the DIP Financing. The DIP Financing will be secured by a lien on all of the Debtors' assets upon the terms outlined in the

59055120.4

DIP Financing Motion, which include a granting of customary post-petition liens and superiority expense claims.

43.    Subject to the terms of the DIP Credit Agreement, the DIP Lender has agreed to make certain advances that will allow the Debtors to pay certain expenditures in accordance with the Budget satisfactory to the DIP Lender, a copy of which is attached to the DIP Financing Motion. The proceeds of the DIP Facility will be used to fund the ordinary course operations of the Debtors during these proceedings, to pay certain fees and expenses associated with the DIP Facility, to provide for adequate protection payments to the Prepetition Lender, subject to the Budget, and to pay for certain of the Debtors' administrative expenses incurred during the Chapter 11 Cases.

44.    As reflected in the Budget, the DIP Facility will fund operating losses during the Chapter 11 Cases while the Debtors work to sell their assets to the highest and best bidder or otherwise maximize the value of the estates for the benefit of their stakeholders through the Chapter 11 Cases. Given the extent of the Debtors' projected operating losses and the expected costs and risks of these proceedings, the DIP Lenders have agreed to provide the DIP Facility for approximately ninety (90) days, which is sufficient to permit the sale of the Debtors'. Without the DIP Lenders' support, the Debtors would be required to terminate their employees and quickly liquidate their assets.

45.    The Debtors believe that the DIP Credit Agreement and related adequate protection represent the best terms currently available to the Debtors. Without access to the DIP Facility, the Debtors will not be able to meet their direct operating expenses and would face the prospect of a complete cessation of operations. For the reasons set forth above and in the DIP Financing Motion, the Debtors submit that the relief requested in the DIP Financing Motion is in

59055120.4

the best interest of the Debtors, their estates, their creditors, and all other stakeholders, and therefore should be approved.

## VI.    IPM Critical Vendor and Settlement Motion

46.    As noted above, a large portion of the Debtors business consists of selling its soups in grocery stores, cafeterias and other retail locations. To administer this line of business, the Debtors executed a Contract Manufacturing Agreement dated July 14, 2016 (the "**Contract**") with IPMF, LLC ("**IPM**"), which maintains an industrial plant for the manufacture of food products. Under the Contract, the Debtors agreed to pay IPM for its production, package, storage, and shipment of the Debtors products to the Debtors customers.

47.    While the Debtors and IPM maintained a successful business relationship, in early 2017, the Debtors began having difficulties paying IPM for products it produced, stored, and delivered to the Debtors customers. Ultimately, the Debtors became indebted to IPM for $345,638.04, leading IPM to terminate the Contract pursuant to its terms in early May 2017.

48.    IPM's refusing to continue producing and shipping the Debtors' products is extremely detrimental to the Debtors' business. The retail sale business line, which relies on the performance of IPM, accounts for a substantial majority of the Debtors' cash flow. Without IPM's continued support, the funding for the Debtors' reorganization efforts from operating revenue would significantly diminish and hinder, if not ruin, the Debtors' ability to maintain the Chapter 11 Cases. Further, finding another manufacturer to perform the services of IPM would require months of negotiations and ramp up time to produce the same products. Thus, the loss of IPM during this period is detrimental, if not fatal, to the Debtors' business and reorganization efforts.

49.    Accordingly, the Debtors and IPM negotiated a Settlement Agreement, which is attached to the IPMF, LLC Critical Vendor and Settlement Motion. Through the motion, the

Debtors have agreed to obtain emergency interim approval of a payment to IPM of $100,000.00 on account of its outstanding claim as a critical vendor payment and, after a final hearing, (i) approval of Settlement Agreement under Bankruptcy Rule 9019, (ii) final approval of the previous $100,000.00 critical vendor payment, and (iii) agreement to pay the remaining amount ($245,638.04) of the IPM's claim under the Contract through proceeds of a sale of substantial all the Debtors' assets or a plan of reorganization. Upon payment of the $100,000.00, IPM will begin its services again for the Debtors. Upon final approval of the Settlement Agreement and payment of the remaining IPM claim, the Debtors and IPM will release each other of all prepetition liability under the Contract.

50.     The Debtors believe that approval of the IPM Critical Vendor and Settlement Motion is in the best interests of the Debtors' estates and creditors. IPM's services are critical to the Debtors efforts to reorganize its business or commence a sale of substantially all its assets as IPM is the only party who can quickly manufacture the Debtors' products during the Chapter 11 Cases. Without approval of the IPM Critical Vendor and Settlement Motion, the Chapter 11 Cases would come out of the gate stumbling, leading to a lower return to creditors, if any at all. Furthermore, the Debtors do not dispute that they are in default under the Contract and owe IPM its claim. Thus, approval of the Settlement Agreement and the critical vendor payment is in the best interests of the Debtors' estates and creditors.

## VII.    **Employee Wage Motion**

51.     In the Wage Motion, the Debtors requests that the Court enter an order authorizing, but not directing, the Debtors, in its sole discretion: (a) to pay to the Employees all accrued prepetition wages, salaries, and other amounts described more fully below (collectively, the "**Employee Claims**"); (b) to honor any prepetition obligations in respect of, and to continue in the ordinary course of business until further notice, the Debtors' medical

15

and perspiration drug reimbursement policies and holiday time policies (collectively, the "**Employee Benefits**"), as described below; (c) to reimburse Employees for prepetition expenses that Employees incurred on behalf of the Debtors in the ordinary course of business (the "**Employee Expenses**"); (d) to remit all related prepetition payroll taxes (the "**Payroll Taxes**") and other deductions (the "**Employee Withholdings**"); and (e) to the extent that any Employee Benefit is administered, insured, or paid through a third-party administrator or provider, to pay any prepetition claims of such administrator and provider in the ordinary course of business to ensure the uninterrupted delivery of payments or other benefits to the Employees (collectively with the Employee Claims, the Employee Benefits, the Employee Expenses, the Payroll Taxes, and the Employee Withholdings, the "**Prepetition Employee Obligations**").

52.    The Debtors also requests an order authorizing the Banks to honor and process checks and electronic transfer requests related to the foregoing.

<u>Payroll and Ordinary Course Compensation</u>

53.    The Debtors' workforce is comprised of four full-time salaried employees (the "**Full Time Employees**") and one part-time hourly employee ("**Part Time Employees**"). All of the Debtors' Employees are stationed in Staten Island, New York.

54.    All Employees are paid bi-weekly on Friday (the "**Pay Day**"). The Salaried Employees are paid for the 80 regular hours ending on the Pay Day and the Hourly Employees are paid one week in arrears to account for the hours worked through the Friday immediately preceding the Pay Day. Payroll to the Employees is funded in gross to ADP, LLC ("**ADP**"), the Debtors' third-party payroll administrator, through ACH at least one day prior to the Pay Day.

55.     The Debtors' most recent prepetition payroll date was June 9, 2017. It covered the pay period from May 27 through June 9, 2017 for Salaried Employees, and May 20 through June 2, 2017 for Hourly Employees. The total amount of the most recent payroll was approximately $18,200.00.[4] The Debtors' next scheduled payroll date is June 23, 2017, which will cover the pay period from June 10 through June 23, 2017 for Salaried Employees and June 3 through June 16, 2017 for Hourly Employees. Consistent with the ordinary course of dealings between the Debtors and ADP, funds in respect of this pay period have not yet been withdrawn from the Debtors' accounts. The Debtors expect that postpetition, two-week payroll expenses through the first three months of this Case will be in the range of approximately $135,000 to $145,000, subject to any postpetition changes in the Debtors' workforce.

56.     In addition, the Debtors have an employment agreement with their CEO, Jamieson Karson. Under his contract, Mr. Karson is entitled to receive bi-weekly salary and quarterly payments of $10,000 as part of his regular payroll and the next such quarterly payment is due on July 1, 2017. There is a balance due and owing him from the April 1 payment of $5,002.

57.     In addition, under his contract, Mr. Karson was entitled to stock compensation of 416,667 shares of common stock per month. In September 2016, the board of directors of the Debtors agreed that Mr. Karson, in lieu of receiving such shares each and every month, may, at his option, in any two months out of a year, receive a cash payment equal to 95% of the value of the stock, not to exceed $15,000.00 in any one month. Mr. Karson elected to receive such cash payment earlier this year but the Debtors have not been able to pay it. As such, the Debtors estimate Mr. Karson is entitled to a cash payment of $8,333.33 on account of his election.

---

[4] The Debtors' payments for workers' compensation debts are included in the payroll amount and deducted and administered by ADP.

58.     The Debtors' ability to maximize the value of the estate for all stakeholders depends on the expertise and continued enthusiasm and service of the Debtors' Employees. Due to the disruption and uncertainty that typically accompanies a chapter 11 filing, the morale and performance of the Employees may be adversely affected. If the Debtors fail to pay the Employee Claims in the ordinary course, the Employees will suffer personal hardship and, in some cases, may be unable to pay their basic living expenses. This outcome would have a negative impact on workforce morale and likely would result in unmanageable performance issues or turnover, thereby causing immediate and irreparable harm to the Debtors and the estates.

59.     The Debtors believe that, as of the Petition Date, approximately $22,235.00 was earned but remains unfunded with respect to Employees on account of accrued prepetition wages and salaries. Pursuant to the Wage Motion, the Debtors seek to pay the outstanding amounts owed to Employees as of the Petition Date for accrued and unfunded wages and salaries, in an amount not to exceed $23,000.00 in the aggregate.

60.     In addition, the Debtors occasionally contract with additional workers, who are either independent contractors or employees leased from temporary placement agencies. As of the Petition Date, there is one additional worker. This individual is compensated outside of the Debtors' payroll system, and receive, in the aggregate, approximately $2,800.00 per pay period. As of the Petition Date, the additional worker is owed approximately $3,000.00 in respect of prepetition services.

61.     The Debtors seek to continue to pay postpetition costs of the Employee Claims in the ordinary course during the pendency of the Chapter 11 Cases (for the avoidance of

18

doubt, no bonus or incentive payments will be made to any insiders unless separately authorized by the Court).

62.     The Debtors pay ADP approximately $85.00 per 2-week pay period for its administrative services (the "**Payroll Processing Fee**"). The Payroll Processing Fee is funded concurrent with the funding of the payroll. As of the Petition Date, the Debtors do not believe that there is any outstanding amount owed to ADP for Payroll Processing Fee. The Debtors, however, seek, out of an abundance of caution, authority to pay any prepetition amounts owing to ADP in respect of the Payroll Processing Fee in an amount not to exceed $85.00 in the aggregate. The Debtors seek authority to continue to make payments in respect of the Payroll Processing Fee postpetition in the ordinary course during the pendency of the Chapter 11 Cases.

Employee Benefits

63.     Prior to the Petition Date, the Debtors offered Full Time Employees ("**Eligible Employees**") paid medical and prescription drug coverage and certain paid holidays (the "**Employee Benefits**"). The amounts set forth below reflect the approximate prepetition cost of Employee Benefits, which the Debtors seek to continue in the ordinary course of its business. The Debtors expect that Employee Benefits going forward will be consistent with prepetition practices.

64.     *Medical and Prescription Payments*. The Debtors reimburse Eligible Employees for their individual medical and prescription drug costs. The average monthly cost to the Debtors for payment of medical and prescription benefits has been approximately $6,700.00. As of the Petition Date, the Debtors believe they owe $8,500.00 in respect of the prepetition medical and prescription benefits. The Debtors seek authorization to pay prepetition amounts in respect of the medical and prescription benefits in an amount not to

19

exceed $8,500.00 in the aggregate. The Debtors seek authorization to continue to pay postpetition costs of the medical and prescription benefits in the ordinary course during the pendency of the Chapter 11 Cases.

65.     *Paid Holidays.* The Debtors offer paid holidays for Full Time Employees in observance of both federal, and, in some cases, state holidays (the "**Paid Holidays**"). Employees are paid their salary for Paid Holidays if they do not work on such holiday, or may apply the Paid Holiday to a different day if the employee works on such holiday. As of the Petition Date, the Debtors believe that no amounts are owed to Employees in respect of Paid Holidays. The Debtors seek authorization to continue to pay postpetition costs of the Paid Holidays in the ordinary course during the pendency of the Chapter 11 Cases.

66.     *Honoring Prepetition Benefits.* As of the Petition Date, certain of the Employee Benefits described above may remain unpaid or not yet provided because certain obligations of the Debtors under the applicable plan, program, or policy accrued either in whole or in part prior to the commencement of the Chapter 11 Cases, but will not be required to be paid or provided in the ordinary course of the Debtors' business until a later date. The Debtors seek authority to pay or provide as they become due all amounts in respect of the Employee Benefits described above that have already accrued, subject to the caps set forth herein.

67.     *Continuation of Benefits Programs Postpetition.* The Debtors also requests confirmation of its right to continue to perform its obligations with respect to these Employee Benefits in the ordinary course for the duration of the Chapter 11 Cases. These programs are an important component of the total compensation offered to the Employees, and are essential to the Debtors' efforts to maintain Employee morale and minimize attrition among those Employees whose retention is important for the Debtors' success.  The Debtors believe that the

expenses associated with honoring such programs are reasonable and necessary in light of the potential attrition, loss of morale, and loss of productivity that would occur if such programs were discontinued.

Employee Expenses

68.     Prior to the Petition Date, the Debtors directly or indirectly reimbursed Employees for certain expenses incurred on behalf of the Debtors in the scope of their employment (the "**Employee Expenses**"). The Employee Expenses are incurred in the ordinary course of the Debtors' business operations and include, without limitation, expenses for meals, travel, lodging, and other business-related expenses. Historically, approximately $5,000.00 has been paid by the Debtors on account of Employee Expenses each month. Because a delay often occurs between the time such expenses are incurred and the time an expense reimbursement request is submitted, it is difficult to determine with precision the aggregate amount of outstanding Employee Expenses. However, the Debtors estimate that, as of the Petition Date, approximately $3,500.00 in Employee Expenses remain unpaid.

69.     Absent authority to pay the Employee Expenses incurred prepetition, the Debtors' Employees could be obligated to pay such amounts out of their personal funds, which would be unfair and would hurt morale, likely resulting in Employee turn-over or performance issues that would cause immediate and irreparable harm to the Debtors and the estates. The Debtors therefore seek authority to pay outstanding prepetition Employee Expenses in an amount not to exceed $3,500.00 in the aggregate, and to continue the foregoing policy in the ordinary course during the pendency of the Chapter 11 Cases.

<u>Employee Withholdings and Payroll Taxes</u>

70.     The Debtors' payroll administrator, ADP, routinely deducts certain amounts directly from Employees' compensation that represent earnings that judicial or government authorities or the Employees have designated for deduction, including, for example, various federal, state and local income, Federal Insurance Contribution Act ("**FICA**") and other taxes, support payments and tax levies, savings programs contributions, benefit plans insurance programs, and other similar programs (the "**Employee Withholdings**").

71.     The amount deducted and remitted by the Debtors in respect of Employee Withholdings is approximately $3,100.00 in the aggregate per pay period. In addition, the Debtors are responsible for remitting to ADP, for its own account, various taxes and fees associated with payroll pursuant to the FICA and federal and state laws regarding unemployment and disability taxes ("**Payroll Taxes**"). The Debtors have paid approximately $1,500.00 in the aggregate for employer-obligated Payroll Taxes each month. The Debtors seek authority to deduct and remit accrued but unfunded Employee Withholdings, in an amount not to exceed $3,100.00 in the aggregate, and to remit Payroll Taxes, in an amount not to exceed $1,500.00 in the aggregate, and to continue to deduct and remit the Employee Withholdings and to remit the Payroll Taxes in the ordinary course during the pendency of the Chapter 11 Cases.

**VIII.    <u>Insurance Motion</u>**

72.     The Debtors seek entry of an order (i) authorizing, but not directing, the Debtors to (a) continue and, to the extent necessary, revise, extend, renew, supplement, or change its prepetition Insurance Policies, or enter into new policies, if necessary, in the ordinary course of business and pay all prepetition obligations in respect thereof, including brokerage and administrative fees (collectively, the "**Insurance Policy Obligations**"), and (b) continue and, to the extent necessary, revise, extend, renew, supplement, or change the Debtors' insurance

22

premium financing programs (each, a "**Financed Program**" and, collectively, the "**Financed Programs**"), or enter into new premium Financing Programs, as necessary, in the ordinary course of business and pay prepetition obligations in respect thereof.

73.    In connection with its business operations, the Debtors maintains multiple Insurance Policies that vary in amounts and types of coverage in accordance with prudent business practices, state and local laws governing the jurisdictions in which the Debtors operates and various contractual obligations. The Insurance Policies include (a) general commercial liability (commercial general, commercial property, terrorism, and automobile), (b) commercial umbrella liability, and (c) director and officers' and employment practices liability.

74.    The total annual premiums under the current Insurance Policies are approximately $92,756.21, including all related fees and charges. These premiums are paid to the relevant Insurance Carriers through the Financing Agreement (defined below).

75.    The Debtors believe that approximately $76,000 in prepetition amounts owing to the Insurance Carriers with respect to the Insurance Policies. In an abundance of caution, the Debtors seek authority to pay any prepetition amounts in respect of the Insurance Policies, in an amount not to exceed $76,000.00, and to continue to pay postpetition costs with respect to the Insurance Policies in the ordinary course of business during the pendency of this Case.

76.    The Debtors' director and officers' insurance premiums are financed. The Debtors finance their premiums because it is not economically advantageous for the Debtors to pay those premiums in full on a lump-sum basis. The director and officers' insurance is financed pursuant to a finance agreement (the "**Financing Agreement**") with US Premium Finance ("**US Premium**"). Under the Financing Agreement, the Debtors made a down payment of $11,550.00. The Debtors is obligated to make monthly payments of $7,447.56 on the 1st of each month in

advance for that month. The Debtors have made 1 of their 9 payments under the Financing Agreement, and have not made their June 1, 2017 payment. The Debtors will be obligated to make a payment of $7,447.56 by July 1, 2016.

77.     In connection with the procurement and maintenance of their Insurance Policies, the Debtors obtain brokerage services from Vanbridge, LLC (the "**Broker**"). The Broker assists the Debtors in obtaining comprehensive insurance for the Debtors' operations by, among other things, assisting the Debtors' with the procurement and negotiation of the Insurance Policies, and enabling the Debtors to obtain those policies on advantageous terms and at competitive rates. Historically, the Broker's fees (the "**Brokerage Fees**") are included in the premiums. The Debtors do not believe there are any prepetition amounts owing with respect to the Brokerage Fees. The Debtors seek authority to continue to pay postpetition costs with respect to the Brokerage Fees in the ordinary course of business during the pendency of the Chapter 11 Cases.

78.     The coverage provided under the Insurance Policies is essential for preserving the value of the Debtors' assets and, in many instances, such coverage is required by various regulations, laws and contracts that govern the Debtors' business operations. Moreover, I understand that maintenance of insurance policies is required by the operating guidelines established by the Office of the United States Trustee. If the Debtors fails to perform its obligations under the Insurance Policies and Financed Programs, their coverage thereunder could be voided. The Debtors may also need to renew or replace certain of the Insurance Policies and Financed Programs during the course of this Case, or enter into new policies. If the Debtors does not pay prepetition amounts owing in respect of the Insurance Policies, there is a risk that the Insurance Carriers will refuse to renew the Insurance Policies.

79.      Similarly, continuing to perform under the Financing aagreements on a postpetition basis is in the best interests of the Debtors' estate. Moreover, given the Debtors' current financial circumstances, the Debtors may have difficulty securing alternative premium financing on terms as favorable as under the Financing Arrangements. In any event, the Debtors is highly unlikely to obtain such financing on an unsecured basis. Thus, the Debtors' ability to continue performing under and renew the Financing Aagreements is likely to preserve estate value. In addition, if the Debtors was unable to continue honoring their obligations under the Financing Agreements, US Premium may seek relief from the automatic stay to terminate the Financed Programs which, if granted, would require the Debtors to obtain replacement insurance on an expedited basis and likely at greater costs for the Debtors. Even if the Financed Programs were not terminated, any interruption in the Debtors' payments could adversely affect the Debtors'' ability to finance premiums for future policies.

80.      For the reasons already set forth herein and in the Insurance Motion, I believe the relief requested in the Insurance Motion is necessary to avoid immediate and irreparable harm to the Debtors, for the Debtors to operate its business without interruption, and to preserve value for the Debtors' estate.

I declare under penalty of perjury that, to the best of my knowledge after reasonable inquiry, the foregoing is true and correct.

Dated: June 15, 2017                      /s/ Michael Wyse
                                          Michael Wyse
                                          Chief Restructuring Officer and Interim Chief
                                          Financial Officer

59055120.4