## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| THE ORIGINAL SOUPMAN, INC., *et al.*, | Case No. 17-11313 (LSS) |
| Debtors.[1] | Jointly Administered |

| | |
|---|---|
| SOUPMAN, INC., | |
| Plaintiff, | |
| v. | Adv. Proc. No. 17-_____ (LSS) |
| WEALTHCOLONY MANAGEMENT GROUP, LLC; WEALTHCOLONY SPV II, L.P.; JOSEPH HAGAN; JEFFREY FREEDMAN, | |
| Defendants. | |

## ADVERSARY COMPLAINT

### Nature of the Action

Soupman, Inc. (the "**Plaintiff**") files this complaint (the "**Complaint**") to enjoin WealthColony Management Group, LLC ("**GP**"), WealthColony SPV II, L.P. ("**SPV**", together with GP, "**WealthColony**"), Joseph Hagan, Jeffrey Freedman (GP, SPV, WealthColony, Hagan and Freedman are collectively referred to herein as the "**Defendants**") from (a) soliciting the written consent of the Plaintiff's shareholders in an effort to remove the remove the above-captioned debtors' (the "**Debtors**") board and officers, and (b) exercising or enforcing the written consents to remove the Debtors' board and officers. The Defendants are using false and

---

[1] The Debtors, together with the last four digits of each Debtor's federal tax identification number, are: The Original Soupman, Inc. (0182); Soupman, Inc. (8630); and Kiosk Concepts, Inc. (4839). The location of the Debtors' corporate headquarters and the service address for all Debtors is 1110 South Ave. Suite 100, Staten Island, NY 10314.

misleading statements and information in their communications to shareholders and the public to smear the Debtors' reorganization efforts and management. The Defendants' actions jeopardize the Debtors' proposed reorganization, damage the asset value of the estates, and harm creditors and other shareholders. Thus, the Defendants' conduct is a clear abuse of the corporate form and the Debtors chapter 11 cases (the "**Cases**").

**Jurisdiction and Venue**

1.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 157(b)(1), 28 U.S.C. §§ 1334(b) and (e)(1) and 28 U.S.C. § 2201 et seq. This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.      Venue for this adversary proceeding is proper pursuant to 28 U.S.C. § 1409 because this adversary proceeding arises under title 11 of the United States Code (the "**Bankruptcy Code**"), involves the Debtors' estates, and arises in and is related to the Debtors' Cases, which is pending in this District.

**Parties**

3.      Plaintiff is the publicly-traded parent of the Debtors, incorporated under the laws of the State of Delaware, with its principal place of business in Staten Island, New York.

4.      GP is the general partner of SPV, and a Delaware limited liability company, with its principal place of business at 745 Hope Rd., Eatontown, NJ 07724.

5.      SPV is a Delaware limited partnership, which holds approximately 67 million common shares of Plaintiff, representing 23.3% of the common shares, with its principal place of business at 745 Hope Rd., Eatontown, NJ 07724.

6.      Defendant Hagan is a resident of New Jersey and executive officer and promoter of SPV, and a member of GP.

2

7.      Defendant Freedman is a resident of New Jersey and executive officer and promoter of SPV, and a member and manager of GP.

## General Allegations

### Company Background

8.      The Debtors business began as a soup manufacturer in 2001. In 2004, the Debtors signed a license agreement with Yegan Food Inc. Yegan Food Inc. operated a soup restaurant since 1984 in New York located at 259-A West 55th Street in New York, run by Ali "Al" Yeganeh. This restaurant became a worldwide destination for soups, being rated #1 by Zagat and praised by the New York Times as "Art, not Soup." The fame of the business and its soup rose to even greater heights after a 1995 "Seinfeld" episode in which the irascible Soup Nazi berates customers who stand in long lines for his legendary soup, often yelling "No soup for you!"

9.      Since that time, the Debtors significantly expanded their reach and operations. The Debtors sell soups in 17-ounce Tetra Recart packaging to grocery chains and club stores throughout the United States, through on-line retailers, and in frozen 4 pound bulk packaging to its franchise restaurants and to the New York City School System.

10.      The Plaintiff, the Debtor-parent, is publicly traded on the OTCQB and primary obligor on the unsecured notes below. The Original Soupman, Inc. is a wholly-owned subsidiary of the Plaintiff and the operating entity of the Debtors, has all the necessary licenses and owns all intellectual property to operate the business. Kiosk Concepts, Inc. is an 80% owned subsidiary of The Original Soupman, Inc., with the remaining 20% owned by Al Yeganeh, and was created to license the intellectual property to franchisees.

11.      The Debtors have a two member board of directors comprised of Jamieson Karson, its Chairman and Chief Executive Officer (the "**CEO**"), and Ronald Crane, an

3

independent third-party.[2] As detailed below, in May, 2017 the Debtors appointed Michael Wyse as their Chief Restructuring Officer (the "**CRO**").

12.     The Debtors currently have approximately $11.9 million in debt, consisting of:

    a.  approximately $1 million in super-priority debtor in possession financing (the "**DIP Financing**") approved pursuant to an interim order;

    b.  approximately $4.7 million in prepetition secured debt;

    c.  approximately $600,000 in alleged IRS liabilities arising from the former CFO's alleged misconduct, which may become secured once enforced; and

    d.  approximately $5.3 million in unsecured debt.

13.     The Debtors' prepetition equity included approximately 9 million preferred shares and 288 million common shares, which have zero value.

14.     With the DIP Financing, the Debtors were able to begin purchasing new products to replenish their inventory and sales channels, address necessary company expenses, fund the Cases, and settle a dispute with a critical prepetition vendor. The Debtors are proposing a sale process consistent with the milestones in the DIP Financing in an effort to maximize the return to creditors.

<u>The Involvement of the Defendants with the Debtors</u>

15.     The Defendants are penny stock investors that have been investors in, or at least interested in, the Debtors for quite some time. When the Debtors hired the CEO in August of 2015, the Defendants frequently communicated with the Debtors' management, especially the CEO, attempting to influence the Debtors' business. Many of these conversations were instigated by Defendant Hagan.

---

[2] Randy Beller, who WealthColony proposes to replace existing board members was previously a member of the Debtors' board of directors. Mr. Beller resigned on the day that Debtor's former CFO was indicted, effectively abandoning the Debtors.

59328911.5

<u>Defendant Hagan's Attempts to Obtain Personal Compensation</u>

16.     Over the course of the summer of 2016, Defendant Hagan attempted to extort the Debtors. From June to September, Defendant Hagan sent numerous text messages to the CEO, stating for example, "Hope all is well, Not getting paid is putting a serious strain on my finances, **please let me know when I can expect to be paid** , my account is overdrawn and this hurts my credit . . . ." <u>See</u> <u>Exhibit A</u>, Msg. from J. Hagan to J. Karson (June 17, 2016) (emphasis added).

17.     The CEO did not know why Defendant Hagan expected to be paid, or for what. <u>See</u> <u>Exhibit B</u>, Declaration of Jamieson Karson ¶ 9.

18.     Later in July, Defendant Hagan messaged reassurance in the discussion he and Defendant Freedman had with the CEO concerning the Debtors' business at a series of prior meetings. <u>See</u> <u>Ex. A</u>, Msg. from J. Hagan to J. Karson (July 25, 2016). But a few days later in early August, Defendant Hagan simply asked for money:

> Jamie, thanks for your time yesterday, I am working on the proposal . . I will do the work at cost for the first 90 days and revisit. I will follow up with you in the meantime, **it is really important for me and my family to restart the payroll for me. I have always been there for the company and this is hardly much to ask.**

<u>Ex. A</u>, Msg. from J. Hagan to J. Karson (Aug. 5, 2016) (emphasis added).

19.     Although the CEO discussed numerous proposals for the Debtors' business in efforts to improve finances and operations throughout his tenure, the CEO has never understood why Defendant Hagan demanded to be placed on payroll or his proposed involvement in the operations of the Debtors. <u>See</u> Karson Decl. ¶ 9.

20.     Later, on August 30, 2016, Defendant Hagan sent the CEO another message stating, "I realize it is the end of the month. I know you are busy and didn't have time for me yesterday. **I need to be put on payroll again asap.** And we also need to speak about stock awareness plan." <u>Ex. A</u>, Msg. from J. Hagan to J. Karson (Aug. 30, 2016) (emphasis added).

59328911.5

Two days later, Defendant Hagan insinuated that the Debtors should compensate him somehow by stating, "**Don't forget me[.] I need love** and so does soup." <u>Ex. A</u>, Msg. from J. Hagan to J. Karson (Sept. 1, 2016) (emphasis added).

21.     The CEO responded the same day informing Defendant Hagan that they can meet next week. Defendant Hagan responded that day, stating, "Ok. I have a plan for soup[.] **In the meantime, please resume payroll, Bob had the numbers** as does sebby." <u>Ex. A</u>, Msg. from J. Hagan to J. Karson (Sept. 1, 2016) (emphasis added). Bob is a reference to Robert Bertrand, the Debtors' former-CFO, who is under indictment failing to pay certain payroll and withholding taxes for the period 2010 to 2014.

22.     After then harassing the CEO with messages like, "Still waiting," and "And waiting .", <u>Ex. A</u>, Msg. from J. Hagan to J. Karson (Sept. 6 & 7, 2016), Defendant Hagan told the CEO, "Ok. **I don't think I am asking a lot** and have been extremely patient. Thanks for response." <u>Id.</u> (emphasis added). Presumably, this refers to his request to be "paid" or "put on the payroll."

23.     During these exchanges, the CEO never promised Defendant Hagan he would be paid, put on payroll, or compensated in any way, other than the same as any other shareholder of the Plaintiff. <u>See</u> Karson Decl. ¶ 11. The CEO is also unaware of how Defendant Hagan can assert that he should be on payroll "again." <u>Id.</u> ¶ 9. Since joining the Debtors, the CEO has used ADP to process all payroll. <u>See</u> *Declaration in Support of Petitions and First Day Pleadings* [Docket No. 19] ¶ 54 (the "**First Day Declaration**"). The CEO believe this to be a form of extortion by Defendant Hagan. <u>Id.</u> ¶ 11.

24.     Upon information and belief, if Defendant Hagan was previously on the Debtors' payroll, that would have occurred prior to Mr. Karson's involvement.

59328911.5

25.     Towards the end of 2016, the Debtors' finances continued to deteriorate. At the time, the CEO and the Debtors' employees continued operations and attempted to resolve the capital structure. <u>See</u> Karson Decl. ¶¶ 6, 12-14. The CEO listened to all proposals, including communicating with the Defendants. <u>See</u>, <u>e.g.</u>, <u>id.</u> ¶ 9.

26.     Nevertheless, the Defendants still attempted to advance their personal financial interests. For example, Defendant Hagan sent a message to the CEO stating, "I asked Sebby to reach out to you yesterday regarding **my pressing liquidity issue**[.] I would take 50% of what's owed to me." Ex. A, Msg. from J. Hagan to J. Karson (Dec. 23, 2016) (emphasis added). The CEO did not know what Defendant Hagan meant when he said "what's owed to me." <u>See</u> Karson Decl. ¶ 9. Upon inquiry, Defendant Hagan informed the CEO that it was essentially for being a "good soldier" to the company in prior times. <u>See</u> Karson Decl. ¶ 10.

<u>As the Debtors Became Increasingly Insolvent,<br>the Board Acted to Maximize the Return to Creditors</u>

27.     As 2017 progressed, the Debtors realized they needed to take action regarding their dwindling finances. <u>See</u> Karson Decl. ¶¶ 12-14 . The Debtors' finances became so strained that they could no longer order new product and had to partially fill purchase orders with what limited inventory they had left. <u>Id.</u> ¶ 12. Under this strain, the Debtors hired Wyse Advisors LLC in mid-May 2017 to pursue a distressed capital infusion. <u>See</u> First Day Decl. ¶¶ 17, 30.

28.     On May 23, 2017, the indictment of the Debtors' then-Chief Financial Officer and President, Robert Bertrand, was unsealed and included allegations for failure to pay certain payroll and withholding taxes for the period 2010 to 2014. Mr. Bertrand has been suspended without pay pending the outcome of his case. <u>See</u> <u>Exhibit C</u>, Indictment, <u>United States v. Bertrand</u>, No. 17-186 (Apr. 8, 2017).

29.     The Debtors immediately requested that the CRO take on Mr. Bertrand's duties and provided Mr. Wyse with sole control over each of the Debtors' debtor-in-possession bank accounts.

30.     Mr. Bertrand's indictment significantly impeded the Debtors' ability to secure further financing. As a result, the Debtors only avenue for relief from their balance sheet obligations and to maintain operations was to seek protection under Chapter 11 of the Bankruptcy Code and file the Cases.

<u>WealthColony Begins to Threaten the Debtors</u>

31.     After the announcement of Mr. Bertrand's indictment, Mr. Beller resigned from the Board and the Defendants communications with the Debtors turned from "give me money" to "give me the company." The Defendants used the Debtors' dire financial straits and the former CFO's indictment as a way to smear the Debtors' board and management to other shareholders, the public, and the Debtors in an effort to take over the Debtors.

32.     On May 25, 2017, the Defendants filed a Schedule 13-D with the SEC disclosing their recent acquisition of equity and attached a letter (the "**May 25 Letter**") calling for the resignation of the current board members and the appointment of Defendant Freedman to the board of the Debtors. <u>See</u> *WealthColony Management Group, LLC's Preliminary Objection to Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507, Fed. R. Bankr. P. 2002, 4001, 6004 and 9014 and Del. L. R. Bankr. P. 4001-2 (I) Authorizing the Debtors to Obtain First Priority and Priming Postpetition Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Liens and Super-Priority Claims, (IV) Granting Adequate Protection to Prepetition Lenders, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* [Docket No. 31], Ex. A (the "**WealthColony Objection**").

33.     Then, on June 2, 2017, the Defendants offered a "restructuring proposal" to the Debtors (the "**June 2 Letter**"), and filed it with the SEC, which included outrageous concepts such as: (a) retaining the CEO as a lame-duck while transitioning to a new CEO, and the CEO agreeing to surrender all his earned shares in the Plaintiff and any right to future share compensation; (b) engaging in a likely fraudulent transfer of the bulk soup business to a new company owned by the Defendants for $1 million; (c) using the $1 million in proceeds to somehow satisfy approximately $10.9 million in prepetition debt; and (d) ending with the threat that if the parties do not agree on a proposal, the Defendants will seek to remove the board. See WealthColony Obj., Ex. B.

34.     The Debtors responded to the June 2 Letter by asking the Defendants to execute a nondisclosure agreement ("**NDA**"). See Karson Decl. ¶¶ 17-20. Like all publicly traded companies, the Debtors could not risk disclosing material nonpublic information of the Debtors to the Defendants, who could then trade on that information. Id. The Defendants refused to sign an NDA. Id.

35.     The Defendants' refusal to sign the NDA is not surprising as they continued to trade shares of the Plaintiff after the June 2 Letter. During this period, the average daily trading volume of Plaintiffs' stock increased by ten percent during until the Defendants' filed for bankruptcy. See Karson Decl. ¶ 20.

36.     On June 6, 2017, the Defendants sent, and publicly filed, another letter (the "**June 6 Letter**") to the Debtors: (a) blaming the Debtors for the Defendants' failure to sign a simple NDA in order to begin discussions; (b) criticizing the board members for not having purchased the Plaintiff's equity with their personal funds; (c) blaming the board for Mr. Bertrand's

indictment; and (d) criticizing the board's capital raising and financial strategies. See WealthColony Obj., Ex. C.

37.    In addition, the June 6 Letter demanded that the board allow the Defendants to inspect the Debtors' shareholder rolls on June 14. Id. The letter gave the board five business days to respond. Id.

38.    Without waiting for a response to the June 6 Letter, the Defendants sent and publicly filed another letter on June 9, 2017 (the "**June 9 Letter**") to the Debtors, highlighting additional "concerns," including: (a) the use of prior financing obtained by the Debtors; (b) the lack of inventory despite the prior financing; (c) the former CFO's activities; and (d) the role of Sebastian Rametta, who has a criminal record from 16 years ago.[3] See WealthColony Obj., Ex. D.

The Debtors Take Action to Maximize Value for Creditors

39.    On June 13, 2017, the Debtors filed voluntary petitions for relief under chapter 11 of the United States Code, commencing the Cases.

40.    On June 13, 2017, the Debtors responded to the June 6 Letter within the required deadline, disclosing the Debtors' bankruptcy filings and stating that the CRO "is discussing your request with the Company's transfer agent." Exhibit D, Ltr. from P. Feigen to J. Freedman (June 13, 2017).

41.    On June 16, 2017, the Debtors filed a motion seeking to obtain $2 million in DIP Financing, with $1 million to approved on an interim basis. See Docket No. 24. In pursuing this financing, the Debtors contacted approximately 75 interested parties, executed nearly 35

---

[3] Mr. Rametta, who has worked with the Debtors since approximately 2004, has significant experience with the Debtors, their business operations, and their primary customers. Mr. Rametta pled guilty in 2001 to his involvement in a payment to a broker in 2000. He received six months of home detention as part of a plea and has had a clean record since that time.

59328911.5

executed NDAs, and received two submitted proposals, one of which demanded a large upfront deposit, which the Debtors could not afford to pay. See First Day Decl. ¶ 41. The DIP Financing is and will be used to fund the ordinary course operations of the Debtors during the Cases, pay fees and expenses to the DIP Lender, and adequate protection payments to the prepetition secured creditors, and for administration of the Cases. Id. ¶ 43.

<u>The WealthColony DIP Objection Contains Wildly Inaccurate Factual Assertions</u>

42.     Shortly before the hearing to approve the $1 million interim DIP Financing on July 20, 2017, the Defendants filed the WealthColony Objection, argued that the full $1 million interim financing was unnecessary (WealthColony Obj. ¶¶ 2, 14); accused the Debtors' management of being part of the former CFO's misconduct (id. ¶¶ 6-7); accused the Debtors of ignoring the Defendants and their concerns; (id. ¶ 8); threatened to replace management (¶ 9); and accused the Debtors of not obtaining the best financing available (id. ¶ 12).

43.     As explained below, despite publicly making these allegations in the Letters and the WealthColony objection, the Defendants knew or should have known that the allegations were false or misleading.

44.     First, the former CFO of the Debtors is no longer with the Debtors and was not involved in the DIP negotiation or the filing of the Cases. He was suspended without pay the day after the indictment against him was unsealed on May 23, 2017. See First Day Decl. ¶ 30. The indictment against the former CFO does not include any charges against the Debtors or their current officers and employees. In addition, the CEO of the Debtors did not join the Debtors until August 2015, well after the time-period of the former CFO's allegedly criminal conduct from 2010 to 2014. See id. ¶ 29. Finally, the Debtors' CRO, who joined the Debtors shortly prior to termination of the former CFO, was the primary party involved in the DIP Financing solicitation

and negotiation process. Id. ¶ 41. Thus, the current management of the Debtors, the filing of the Cases, and the negotiation of the DIP were, and are, free from any problems associated with the former CFO.

45.     Second, as detailed herein concerning the Defendants' Letter campaign, the Debtors did not ignore the Defendants and responded to both their request to obtain the shareholder list and their restructuring proposal.

46.     Third, at the interim DIP hearing, the Defendants ultimately agreed to the Debtors' proposed use of the DIP Financing or the process used to obtain the financing. And, importantly, when the Court adjourned the hearing for parties to revise the DIP Financing to address issues with fees and expenses, the Defendants did not press their restructuring proposal and did not offer better financing to the Debtors.

47.     The Defendants attached to the WealthColony Objection the prior letters sent to the Debtors and a declaration of Defendant Hagan (the "**Hagan Declaration**"). See WealthColony Obj. The Hagan Declaration contains a litany of falsehoods and misinformation based largely on unsubstantiated hearsay that Hagan could never substantiate in Court.

48.     In the Hagan Declaration, Defendant Hagan first accused management of engaging in "pervasive wrong-doing," supported by his hearsay "conversations with federal investigators." Hagan Decl. ¶ 4. But the indictment does not name any other employee at the Debtors and does the Debtors themselves as defendants. See Ex. C. Further, neither the Debtors nor its management has received any inquiries from federal investigators beyond prior questions related to the former CFO's activities. See Karson Decl. ¶ 16. Defendant Hagan would know this if the Defendants signed the routine NDA presented in response to their restructuring proposal and were able to review the Debtors' diligence information.

49.     Defendant Hagan then accused the Debtors of not responding to the June 2 Letter's restructuring proposal. Hagan Decl. ¶ 6. But the Debtors did respond by requesting the Defendants sign an NDA, which request the Defendants acknowledge in their June 6 Letter. See June 6 Letter (stating, "Through Company counsel, we have been advised that the Board is unwilling to meet with us unless a non-disclosure agreement is signed . . . .").

50.     Defendant Hagan also accused the Debtors of refusing to furnish the stockholder list, even though the Debtors responded that they were inquiring with the transfer agent. Id. ¶ 7.

51.     Defendant Hagan further accused the Debtors of the misuse of funds from its prior secured financings based on, again, hearsay "input received from individuals formerly associated with the Debtor[s]" and by tying that accusation with a public disclosure that an employee has criminal record and asserting that the employee is involved in management. Id. ¶ 8.

52.     The employee at issue is Mr. Rametta, the vice president of sales, not management. See Karson Decl. ¶¶ 37-38. He only provides input to the board and management when a question arises in his area of expertise: sales. Id. Mr. Rametta has spent the past 30 years in the food industry, and the prior 12 years with Debtors. He is the primary point of contact on all sales accounts. Mr. Rametta focuses nearly all of his time and effort on building sales. See id.

53.     Defendant Hagan then accused the Debtors of not responding to the June 9 Letter, which they did. Hagan Decl. ¶ 9. See Ex. D.

54.     Defendant Hagan then made the unsubstantiated allegation that he and other stockholders believe management "has been engaged in improper activities and have breached their fiduciary duties." Id. ¶ 10.

55.     Defendant Hagan finally asserted a series of misinformation about the Debtors business in his Declaration. For instance, he states "franchisees have been asked to send payments for inventory to a lockbox account in Chicago, Illinois," and he questions "where the Debtor[s] ha[ve] recorded those recipes as revenues of [the] Debtor[s]." Id. ¶ 11.

56.     The Debtors have learned that the Defendants have reached out to franchisees to discuss the Debtors' business practices without informing the Debtors. See Karson Decl. ¶¶ 39-40. This "lockbox" allegation concerns the Debtors prior payment practice for its former soup producer, Park 100 Foods ("**Park 100**"), in which the Debtors would direct product payments from franchisees to Park 100's lockbox. Id. That practice is no longer used because Park 100 is no longer the Debtors' soup manufacturer. Id.

57.     Importantly, the lockbox allegation reveals Defendant Hagan's fundamental misunderstanding of the facts and their efforts to deliberately misconstrue facts in support of their inappropriate attempt to gain control of the Debtors. If the allegations were true, it would mean that the Debtors' management would be directing its franchisees to remit payments to a lockbox for the benefit of a former vendor. This is obviously nonsensical.

58.     Defendant Hagan then alleged that the Debtors offer to sell Tetra-Pak soup to franchisees at a discount instead of bulk soup even though the Debtors have been unable to fulfill its Tetra-Pak sales to grocery stores. Hagan Decl. ¶ 12.

59.     Again, Defendant Hagan is wildly misinformed. The Debtors did offer Tetra-Pak soup to franchisees when the bulk soup was unavailable approximately ten years ago. See Karson Decl. ¶ 41. This was done as an accommodation to franchisees to provide them with product to sell. That practice ended years ago and occurred at a time when the Debtors had

sufficient inventory to fulfill orders to current customers. Id. Defendant Hagan again confuses the Debtors' practices under prior management with current management.

60.     As the Hagan Declaration shows, the Defendants have no qualms asserting unsubstantiated information, falsehoods, misrepresentations, or wildly inaccurate information on the Debtors' business practices to the public through SEC filings and the Cases and directly to shareholders of the Debtors.

The Debtors Are Proceeding With a Sale Process

61.     Since the Court approved the DIP Financing, the Debtors have not received any restructuring proposals from the Defendants. And despite the Debtors public announcement at the interim hearing on DIP Financing that they were seeking to sell the assets, the Debtors have not received a purchase proposal from the Defendants.

62.     Conversely, the Debtors have received inquiries and preliminary from other interested parties for the Debtors' assets. See Exhibit E, Declaration of Michael Wyse ¶ 5. The Debtors have filed a motion to establish bidding procedures for the sale of their assets, with a sale to be approved by the Court in early September 2017. See *Motion of the Debtors for Entry of (I) an Order (A) Approving Bidding Procedures in Connection with the Sale of Substantially All of the Debtors Assets, (B) Approving the Form and Manner of Notice thereof, (C) Scheduling an Auction and Sale Hearing, (D) Approving Procedures for the Assumption and Assignment of Contracts, and (E) Granting Related Relief; and (II) an Order (A) Approving the Asset Purchase Agreement Between the Debtors and the Successful Bidder, and (B) Authorizing the Sale of Substantially All of the Debtors Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, (C) Authorizing the Assumption and Assignment of Contracts, and (D) Granting Related Relief* [Docket No. 56] (the "**Bid Procedures**").

63.    The Defendants would rather scuttle the Debtors' Cases and any potential recovery for creditors by trying to remove management, potentially risking the DIP financing and leaving $1 million of super-priority debt above every other creditor or having the DIP foreclose and acquire the Debtors' assets for $1 million, than simply offering to buy the Debtors' assets under the Bid Procedures.

WealthColony's Inappropriate Consent Solicitation

64.    In fact, after the interim DIP Hearing, the Debtors have learned that the Defendants are soliciting written consents from the Plaintiff's shareholders to replace the board and management of the Debtors in an effort to derail the proposed restructuring.

65.    The Defendants are using unconventional methods under the Debtors' corporate governance to scuttle the Debtors' Cases in an effort to remove management. Section 2.2 of the Plaintiff's bylaws states, "Any director or the entire Board of Directors may be removed, with or without cause, by the holders of a majority of the shares then entitled to vote at an election of directors." Typically, directors are elected, re-elected, and removed at an annual shareholder meeting. See Exhibit F, Soupman, Inc. Bylaws.

66.    However, section 1.10 of the Bylaws permits shareholders to act through written consent to do all things they ordinarily do at an annual or special meeting. Thus, the Defendants are proposing to issue a written consent signed by a majority of the shares currently outstanding to remove the Debtors' board, which board will elect new board members and new officers to pursue WealthColony's agenda.

67.    For example, on June 22, 2017, the Debtors obtained an email solicitation from the Defendants' group sent to a fellow shareholder stating that the Defendants could "raise $2 million in equity" and assume $3 million of the prepetition secured debt as part a restructuring to

preserve current shareholders. See Exhibit G, Email from B. Guadagno (June 22, 2017). The email argues that equity and unsecured creditors should fund the $2 million because they would be "taking a company with total capitalization from ~$12mm to less than ~$5 million by eliminating debt." Id.

68.     This description is materially misleading to shareholders:

a.     First, it only proposes a $1 million actual investment in the Debtors. The other $1 million will have to be spent on refinancing the DIP Financing. How that remaining $1 million investment removes over $7 million in debt is not explained. See id. ("We're taking a company with total capitalization from ~$12mm to less than ~$5mm by eliminating debt.").

b.     Second, if the Defendants are proposing some form of their prior restructuring proposal as stated in their June 2 Letter, the transaction is actually harmful to creditors and shareholders. The transaction would create a "Newco" of participating creditors and shareholders, leaving creditors and shareholders who did not participate in the Defendants' scheme with the over $7 million in debt in the oldco. See June 2 Ltr.

c.     Third, the Defendants do not disclose that the Debtors are in bankruptcy and that the transaction would have to go through an open bidding process and be approved by the Court. The communication presents the transaction as a fait accompli, but there would be serious resistance as the Debtors' major creditor constituents have already agreed to the Bid Procedures and the Debtors' path forward.

d.     Fourth, the Defendants do not disclose that creditors and shareholders could do the exact same thing by participating in the bid process instead of destroying the Debtors' value through a board and management change.

69.     While the Debtors are executing on their reorganization plan, which is evidenced by the budget attached to the DIP Financing, settlements with critical vendors, and implementing the Bid Procedures, the Defendants do not explain to shareholders, the Debtors, or the Court how they plan to generate revenue from their Newco bulk sales.

70.     Further, the Defendants do not explain how they will obtain, negotiate, and execute replacement financing to fund this proposed process. The Defendants proposed removal of management would crater the value of the Debtors. The only individuals with: experience in

17

operating the Debtors; knowledge and relationships with significant customers and vendors; and the ability to find a buyer for the Debtors as a going concern, are existing management, the exact employees the Defendants are attempting to terminate.

<u>WealthColony has Significant Credibility Problems</u>

71.    In all the public mudslinging towards the Debtors' management, including allegations of criminal behavior, "wrong-doing," and pointing out prior misconduct of one employee (who is not management), the Defendants never disclose their own past "wrong doing" to the shareholders they solicit for control.

72.    For example, while attempting to taint the CEO and CRO (the real management of the Debtors) with the former CFO's failure to account for taxes, Defendant Hagan has not disclosed FINRA's "findings that **Hagan evaded an Internal Revenue Service (IRS) garnishment of wages** order by routing commissions he earned to an unregistered person at his member firm." <u>See</u> Financial Industry Regulatory Authority, <u>Disciplinary and Other FINRA Actions</u>,         Apr.         2009,         <u>available         at</u> https://www.finra.org/sites/default/files/DisciplinaryAction/p118481.pdf (last accessed June 21, 2017) (emphasis added).

73.    Randy Beller, whom the Defendants propose to be the new CEO of the Debtors, has twice consented to findings and sanctions from FINRA based on securities law violations. <u>See</u> <u>Exhibit H</u>, Beller FINRA Report. Mr. Beller was previously on the Debtors' board, but resigned when the indictment against the CFO was unsealed, abandoning the Debtors.

74.    The Defendants further fail to disclose that one of their associates, Joe Corso, who was on the phone call with the CEO when the Defendants said they would fire him, <u>see</u> Karson Decl. ¶ 30,  was indicted for insurance fraud, wire fraud, and money laundering. <u>See</u> <u>Exhibit I</u>,

59328911.5

Indictment, United States v. Corso, et al., No. 07-284 (D.N.J. Sept. 12, 2007). Mr. Corso also plead guilty to insurance fraud. See Exhibit J, Judgment in a Criminal Case, United States v. Corso, et al., No. 07-284 (D.N.J. Aug. 6, 2008).

75.     Simply put, the Defendants are painting the Debtors' management with crimes or misdeeds they did not commit while hiding their own from shareholders who they wish to control.

Consequences of WealthColony's Pursuit of Their Agenda

76.     Even more troubling is that the Defendants are not asking for the shareholders to sell their shares to the Defendants. The Defendants are asking the shareholders to give them voting power through written consent to remove the board. The economic consequences of the Defendants' actions will be borne out not by the Defendants but by the shareholders who are being misinformed and, more importantly, the Debtors' creditors and these bankruptcy estates.

77.     If the Defendants obtain control of the board and management, the employees will resign. See Karson Decl. ¶ 43.

78.     The Debtors understand that the Plaintiff's shareholders have a choice in management of the Plaintiff, but the Defendants have engaged in a campaign: (a) to obtain money from the Debtors no matter how illegal or preposterous it seems; (b) that smears the Debtors' management in public and to shareholders; (c) that fails to disclose the economic and operational terms of their reorganization plan to anyone, including the Debtors; (d) that accuses the Debtors' management of ignoring the Defendants; and (e) to solicit the shareholders' voting interests to oust the Debtors' board and risk ruining the Debtors' reorganization, without bearing the economic risk of actually acquiring the shares.

59328911.5

## COUNT I

**Request for a Temporary, Preliminary, and Permanent Injunction Pursuant to 11. U.S.C. 105 and Rule 65 of the Federal Rules of Civil Procedure (as incorporated by Rule 7065 of the Federal Rules of Bankruptcy Procedure)**

79.     The Plaintiff reincorporates the above paragraphs as if stated below.

80.     Unless the Defendants are enjoined from (a) soliciting written consent from other shareholders to remove the Debtors' board and management; (b) exercising such voting rights or written consents; and (c) enforcing such vote or written consent, the Debtors will suffer irreparable harm to their estates and creditors. A true and correct copy of the written consent is attached as Exhibit K.

81.     The Defendants will not suffer any irreparable harm by entry of an injunction as they will retain their holdings, can still buy and sell shares, bid for the Debtors' assets through the Bid Procedures, and participate in the Cases to the extent they have standing.

82.     Under these circumstances, the harm to the Debtors and their estates and creditors absent injunctive relief outweigh the harm to the Defendants as:

a.   The Debtors board and management will be replaced, leaving the Debtors without the expertise and knowledge to shepherd them through the Cases;

b.   The Debtors will be left rudderless in the Cases in terms of strategy of the Cases and operations during the Cases;

c.   The Debtors' employees will resign;

d.   The Debtors' operations will cease;

e.   The DIP Lender may withdraw its financing or declare a default, leaving the Debtors saddled with $1 million in super-priority debt, above all creditors;

f.   Creditors' recoveries will be severely diminished;

g.   The Debtors' ability to generate income will disappear without the needed financing; and

h.  Shareholders will have lost even more economic value at the expense of the Defendants' misleadingly exercising their voting rights through written consents.

83.    The Debtors are likely to prevail on the merits as the Defendants actions are a clear abuse of the Debtors' corporate structure and the Cases. The Defendants' actions and statements are purposefully misleading shareholders and creditors as they have not disclosed in attempting to exercise other shareholders' voting power, that:

a.  The Defendants repeatedly requested improper "payroll" payments form the Debtors;

b.  The Defendants restructuring proposal is borne out of animus to the Debtors' CEO for denying the Defendants' payroll payments;

c.  The Defendants' public statements in SEC filings and in the Cases are often misleading, false, or half-truths;

d.  The Defendants have no clear plan to refinance the Debtors' capital structure;

e.  The Defendants' funding has not been obtained, structured, or executed, and is not available;

f.  The Defendants' reorganization proposal is unrealistic and likely a fraudulent transfer;

g.  The Defendants do not plan to market test any transaction for the Debtors' assets;

h.  The Defendants do not explain how their transaction would obtain Court approval or address objections of other creditors;

i.  Their restructuring proportional creates severe disparate treatment among creditors between those favored by the Defendants and those that are not, regardless of their priority in the Debtors' capital structure;

j.  Any party who wants to bid for the Debtors' assets, individually or as a group, can do so through the Debtors' proposed Bid Procedures, including the Defendants;

k.  The Debtors have no experience in this business, commercial food manufacturing and distribution;

l.  All employees of the Defendants will resign, destroying the value of the Debtors as a going concern;

m. The Defendants are harming the Debtors' relationships with its vendors and franchisees by communicating with them in secret; and

n. Shareholders and creditors are bearing the economic fallout of the Defendants' actions as the Defendants are not actually acquiring the shares and the economic consequences of their actions.

84.     The injunction would be in the public interest. The injunction will ensure the orderly process to the Debtors' Cases, permitting an open and fair auction for the Debtors' assets, and obtain the highest value for the Debtors' assets, all goals of the Bankruptcy Code and policy. Moreover, the injunction still permits the Defendants to bid on the Debtors' assets in an open and fair process.

85.     The Debtors do not have an adequate remedy at law. Thus, an injunction against the Defendants using the written consents to remove the Debtors' board and management is a clear abuse of the corporate form and the Debtors' Cases, and is necessary and essential to the orderly and effective administration of the Debtors' estates and the Cases.

WHEREFORE, The Debtors respectfully request that this Court:

A.     Enter an temporary restraining order enjoining the Defendants from obtaining, exercising, or enforcing the written consents or voting power of other shareholders;

B.     Enter a preliminary injunction against the same;

C.     Enter a permanent injunction against the same; and

D.     Grant any relief this Court deems just and proper.

59328911.5

Dated: June 24, 2017
Wilmington, Delaware

**POLSINELLI PC**

*/s/ Jarrett Vine*

Christopher A. Ward (Del. Bar No. 3877)
Jarrett Vine (Del. Bar No. 5400)
222 Delaware Avenue, Suite 1101
Wilmington, Delaware 19801
T: (302) 252-0920
F: (302) 252-0921
cward@polsinelli.com
jvine@polsinelli.com

-and-

Jeremy R. Johnson (*Admitted Pro Hac Vice*)
600 3rd Avenue, 42nd Floor
New York, New York 10016
T: (212) 684-0199
F: (212) 684-0197
jeremy.johnson@polsinelli.com

*Proposed   Counsel   for   the   Debtors   and
Debtors-In-Possession*

59328911.5